Filed 8/30/13  P. v. Smith CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br>v.<br>BOBBIE LEE SMITH,<br><br>    Defendant and Appellant. | A135139<br><br>(Alameda County<br>Super. Ct. No. H51134) |

Bobbie Lee Smith appeals from a judgment imposed after a jury found him guilty of numerous offenses.  He contends:  (1) evidence that he fired through the front door of his girlfriend's apartment, after telling her that he was going to "come up there right now" and "pop her," was insufficient to support his convictions for attempted murder, assault with a firearm, and endangerment of her child, who was also in the apartment; (2) defense counsel rendered ineffective assistance because he failed to object to the prosecutor's purported misconduct in discussing "abiding conviction" in the context of a reasonable doubt instruction; (3) the court improperly imposed the upper term for his attempted murder and child endangerment convictions; and (4) the term imposed for shooting at an inhabited dwelling should have been stayed.

We will modify the judgment to stay the term imposed for shooting at an inhabited dwelling (Penal Code section 654).  As so modified, we will affirm the judgment.

## I.  FACTS AND PROCEDURAL HISTORY

By information, Smith was charged with attempted murder in count one (Pen. Code, §§ 664, 187, subd. (a)), assault with a firearm in count two (§ 245,

1

subd. (a)(2)), shooting at an inhabited dwelling in count three (§ 246), and child abuse (endangerment) in count four (§ 273a, subd. (a)).[1] As to the count one attempted murder charge, it was alleged that Smith personally used and discharged a firearm. (§§ 12022.5, 12022.53, subds. (b), (c), (g).) As to other counts, it was alleged that Smith personally used a firearm. (§ 12022.5, subd. (a)). It was further alleged that Smith had prior serious felony convictions for sentencing purposes. (§§ 1170.12, 667, subd. (a)).

A. *Evidence at Trial*

On September 15, 2011, victim Krystal L. was at home with her eight-year-old son in a one-bedroom condominium she rented in San Leandro. Her unit, number 203, was located on the second floor of the condominium complex. Entry into the complex required an access code or key. Appellant Smith knew the access code.

The front door to Krystal L.'s unit was equipped with a deadbolt and a lock on the door handle. The door opened into her hallway, which ended at a closet door; the back wall of this closet was also the back wall of the closet of the bedroom behind it. To the right of the hallway was the kitchen and living room; to the left was a hallway leading to the bedroom and a bathroom. Krystal L.'s son usually lived with her, but sometimes stayed with his father.

1. *Smith Threatens to "Pop" Krystal L. on September 15*

According to Krystal L.'s statement to law enforcement, Krystal L. had been dating Smith for about six months and, in conversations with him on September 15, 2011, was attempting to end their relationship. Smith became agitated.

At 8:45 p.m. that evening, Krystal L. received a call from Smith. Because Smith was still agitated and Krystal L. was afraid of him, Krystal L. recorded the telephone conversation on a cassette player.[2] The conversation was played for the jury at trial.

---

[1]     Unless otherwise indicated, all statutory references are to the Penal Code.
[2]     The transcript suggests that the conversation may have spanned two calls, or at least two recordings by Krystal L., re-recorded as one by the investigating officers. Smith's threat was contained in the latter portion.

According to the transcript of the conversation, Krystal L. told Smith "stop calling me," said she did not want to "be with" Smith anymore, and told him to leave her alone and not to "come to [her] house." Smith told Krystal L., "I'll pop your Bitch ass Bitch, stop playing [with] me . . . straight up bitch, me and my niggas come up there right now and kick your shit in Bitch, I'll fill that Bitch." Krystal L. responded, "Come on, come on over here then." To which Smith replied, "Straight up Bitch." Smith continued: "I'll smoke that nigga, … bitch. [¶] Straight up bitch, I heard the word bra. For real, you got me fucked up bitch. Straight up for real, straight up, you feel me."

### 2. *Smith Fires Multiple Shots Through Krystal L.'s Front Door*

Less than 45 minutes later, while Krystal L. was in the living room and her son was asleep in the bedroom, Krystal L. heard knocking or loud banging on her front door. According to her statement to police, Krystal L. did not go to the door, because she thought it was Smith and feared he could harm her if she answered. Krystal L. then heard a voice – which she immediately recognized as Smith's – yelling, "You're doing too much. Open the door." When she heard glass shattering, she looked into her hallway and saw bullet holes; she then ran into the bedroom and got down on the floor with her son.

Krystal L. called 911 at 9:25 p.m., reporting that her "ex-boyfriend" Smith "just shot through [her] door," and that she knew it was Smith because she "heard him and he just told [her] he was coming over." A recording of Krystal L.'s call to 911 was played for the jury.

### 3. *Officers Respond to the Scene*

Alameda County Sheriff's Deputies Chris Mears and Phillip Corvello, among others, responded to Krystal L.'s apartment. They observed five bullet holes in her apartment door, with another bullet hole in the wall next to the door. Of the bullet holes in the door, two were near the peephole and three were lower and grouped together. Because there were no spent cartridges at the scene, the deputies concluded that the shooter had used a revolver. Deputy Corvello also noted that two bullets had

3

entered the closet door at the end of Krystal L.'s hallway; one of them penetrated the back wall of the closet and entered the bedroom (where Krystal L.'s son had been sleeping). Both Krystal L. and her son were distraught, crying, and afraid.

Krystal L. told Deputy Mears that she believed Smith was the shooter. She also disclosed her cassette recording of her phone calls with Smith, which had occurred just before the incident. Krystal L. played the recording for the deputies, explaining that she had made it because she was afraid of Smith. Sergeant Kelly used a digital recorder to record the tape as Krystal L. played it.

### 4. *Krystal L.'s Statements to Deputy Corvello on September 15*

Krystal L. told Deputy Corvello at the scene that, in the telephone conversations with Smith, Smith had made threats about going to Krystal L.'s house, shooting the house, and bringing his friends to harm her. Within an hour after the call, she heard knocking on the front door of her apartment, but she did not respond because she believed it was Smith and feared she would be injured if she did. The knocking increased to banging, and Smith yelled, "You're doing too much" and "open the door." Krystal L. then heard a really loud noise and glass breaking, and she saw bullet holes, including a bullet hole in the bedroom closet.

Krystal L. also signed a written statement prepared by Deputy Corvello to the same effect. According to this statement, which she signed on the night of the incident, Smith had told Krystal L. in a telephone conversation that Krystal L. was "doing too much" and threatened that he and his "folks" were going to "come kick [her] door in and shoot up [her] house," or words to that effect. Krystal L. asserted that she was afraid of Smith and believed he would shoot up her house because he was mad at her for breaking up with him. Around 9:27 p.m., when she and her son were at home, she heard a knock at the door. The knock turned into banging, and Smith yelled at her. Krystal L. then heard glass breaking and saw bullet holes in the door.

While the police were speaking with Krystal L., Smith called her two or three times. At least two of the calls were recorded by Sergeant Kelly and played for the jury at trial. In one call, when Krystal L. asked Smith why he shot through her door, Smith

4

retorted that he was in "the east," referring to Oakland. Phone records indicated, however, that Smith was in San Leandro (where Krystal L. lived) when he called her at 9:21 p.m. – approximately four minutes before Krystal L.'s call to 911 – and also while she was on the phone with 911 around 9:27 p.m.. (These calls went to Krystal L.'s voicemail.)

### 5. *Krystal L.'s Statement to Detective Smyth on September 19*

A few days later on September 19, 2011, Krystal L. was interviewed by Detective Patrick Smyth at the Alameda County Sheriff's department. At trial, the jury was shown a video of the interview and was provided a transcript. In this interview, Krystal L. said she was less certain that Smith was the perpetrator.

Krystal L. told Detective Smyth that Smith lived with his family on Lawlor Street in Oakland. She spoke with Smith the day of the shooting and over 10 times since then, and he denied he shot through her door and was concerned about who did. Krystal L. claimed she and Smith cared for each other and she missed him, and she was now "confused" and no longer definite that he was outside her apartment the night of the shooting. In addition, Krystal L. claimed that she recorded the phone call with Smith weeks earlier, not 45 minutes before the shooting, and she felt guilty because she was mean to Smith when she asked him for money and he did not have it.

### 6. *Smith's Flight and Arrest on September 28*

On September 28, 2011, Oakland police officers Nicholas Miller and Eric Thau drove past Smith's home in a marked patrol car, looking for Smith. Officer Miller observed him on the front porch. When Miller approached and asked Smith to talk with him, Smith retreated inside the residence, shut the door, and left the house through the back door. When confronted in the backyard by Miller, Smith fled. Smith was later found hiding under a porch at another house a distance away, where he was taken into custody.

### 7. *Smith Gets Devale Bright to Dispose of the Gun*

Police monitored Smith's calls while he was in jail. On September 30, 2011, Smith asked his half brother, Devale Bright, whether Bright knew "where that little

5

oowap at." Bright answered that he "got it." According to Deputy Corvello, "oowap" is street slang for a firearm.

In October 2011, Detective Smyth spoke to Bright in a videotaped interview shown to the jury. Bright stated that Smith had instructed him to retrieve and sell a revolver that Smith had hidden by a tree in the back yard. Bright said he sold the gun for $250.00, and showed officers where he had retrieved it.

### 8. *Christie Butler Says Smith Told Her He'd Intended to Shoot Someone*

Detective Smyth testified that in November 2011 he spoke with Christie Butler, who appeared to be Smith's girlfriend. Butler told the detective that in mid-September 2011 – around the time of the shooting at Krystal L.'s apartment – Smith had told her he was going to "pop somebody," meaning to shoot someone.

### 9. *Krystal L. Recants at Trial*

Krystal L. testified that she loved Smith and they were engaged. Contrary to what she told police, Smith had lived with her at the apartment, and he had the entry door code and a key to her apartment. She denied she heard Smith's voice before the shots were fired on September 15. Instead, she claimed, she made up the story that it was Smith because she was angry that he was cheating with another woman. She could not remember speaking to Smith before the shooting, recording a phone call from him, or giving the police a recording of the call. In fact, she testified that she had never even recorded a conversation between her and Smith.

Krystal L. also denied sending text messages to friends that Smith had shot at her door. Although she acknowledged that she signed her written statement, she claimed she was not with Deputy Corvello when he wrote it and did not read it before she signed it. When she went to the police station on September 19 to exonerate Smith, she claimed, Detective Smyth would not listen. She called the District Attorney and left messages, but he did not return her calls. Furthermore, Krystal L. testified, the shooter was not Smith, because she received several threatening phone calls after he was in jail.

### 10. *Bright and Butler Recant at Trial*

At trial, Bright could not remember telling the police that he had retrieved and sold a revolver at Smith's request. He explained that he has "like cerebral palsy and stuff" and gets "like, head rushes and stuff," and did not understand the questions the police were asking. He also claimed that he would have told the police anything just to get out of the interview.

Butler testified that Krystal L. and Smith were not engaged, that she – not Krystal L. – was Smith's girlfriend, and that they had been together for three years. Although she recalled telling Detective Smyth that, around the time of the shooting, Smith had said that he was going "to pop somebody" and was trying to find someone to drive him there, the statement was untrue. She claimed she told the police what they wanted to hear because there was a warrant for her arrest and they threatened to take her daughter away.

### B. *Jury Verdict and Sentence*

The jury convicted Smith on all counts as charged. The jury also found true the allegations that Smith personally and intentionally discharged a firearm (§ 12022.53, subd. (c)) as to count one, and personally used a firearm (§ 12022.5, subd. (a)) as to counts two, three, and four.[3] Smith waived his right to a jury as to the prior conviction allegation, which the court found to be true.

In March 2012, Smith was sentenced to an aggregate term of 51 years 8 months in state prison, comprised of the following: as to the count one attempted murder, the upper term of nine years doubled to 18 years under section 1170.12, plus 20 years for the enhancement under section 12022.53, subdivision (c); for the count three shooting at an inhabited dwelling, a consecutive term of 20 months (one-third the midterm), doubled to three years four months; for the count four child abuse or endangerment, a consecutive term of 16 months (one-third the midterm), doubled to two years eight months, plus 32 months (16 months doubled) for the enhancement under

---

[3]     The court later struck the enhancement on count three, noting it was included on the verdict form in error.

section 12022.5, subdivision (a); plus five years as an enhancement for a prior conviction within the meaning of section 667, subdivision (a)(1).  In addition, on the count two assault with a firearm, the court imposed and stayed the upper term of four years doubled to eight years, plus four years for the enhancement under section 12022.5, subdivision (a).

This appeal followed.

## II.  DISCUSSION

We address Smith's contentions in turn.

### A.  *Attempted Murder*

Smith contends his attempted murder conviction must be reversed on the ground that there was insufficient evidence of his intent to kill, since there was no evidence he knew Krystal L. was home when he shot repeatedly through her front door after threatening to "pop" her.  We disagree.

#### 1.  *Law*

Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.  (*People v. Smith* (2005) 37 Cal.4th 733, 739.)  Intent to kill may exist if there is a deliberate intention to take the victim's life, which may be shown by establishing either that the defendant desired the result or that he knew to a substantial certainty it would occur.  (*Ibid*.)  Because there is rarely direct evidence of the defendant's intent, it may be inferred from the defendant's acts and the circumstances of the crime.  (*Id*. at p. 741.)

We review for substantial evidence.  In this regard, we "[v]iew[ ] the evidence in the light most favorable to the guilty verdict secured by the prosecution, . . . [and] determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  (*People v. Cervantes* (2001) 26 Cal.4th 860, 866; see also *People v. Staten* (2000) 24 Cal.4th 434, 460.)

In this case, the question is whether there is substantial evidence from which the jury could have reasonably inferred that Smith intended to kill Krystal L. when he fired multiple shots through her front door.

8

2. *Application*

Although Smith contends there was no evidence that he knew Krystal L. was inside her apartment, there was, in fact, ample evidence from which the jury could have *inferred* that Smith believed Krystal L. was in the apartment – and more specifically behind her front door – when he repeatedly fired his gun.

In the phone conversation around 8:45 p.m. on the night of the shooting, Smith sounded agitated and threatened Krystal L. that he was going to "come up there" and "pop" her – which is understood to mean he was going to shoot her. Less than 45 minutes later, he arrived at her condominium complex, gained access to her building, and reached the front door of her second-floor apartment, bringing with him a loaded firearm. He banged loudly on Krystal L.'s front door and told her to open it. He then fired six shots – two under the peephole, three lower on the door, and one through an adjacent wall. As Krystal L. told the 911 operator, she knew it was Smith because "I heard him and he just told me he was coming over."[4]

One reasonable inference from this evidence is that Smith went to Krystal L.'s apartment with an intent to kill her, believed she was there as he was banging on the door and *telling her to open it*, and after summoning her to the door fired multiple times through the door because he believed she was on the other side, thus acting on his intent to kill her.

---

[4]     Respondent asserts that Krystal L. had locked her apartment door with a keyed lock from the inside, which would indicate to Smith that she was home. Respondent's citation to the record, however, points only to her testimony that the door had a bolt lock and a "regular" lock at the bottom – it said nothing about the door being locked with a key from the inside at the time of the shooting, let alone that Smith knew about it. Krystal L. did tell the 911 operator that she was "locked in" her house at the time of the 911 call, but we are not pointed to any evidence that Smith knew she had locked herself in when he fired his weapon. At another point in Krystal L.'s testimony, she stated that when she would leave her apartment, she would lock the bottom lock from the inside, close the door, and then lock the top bolt with a key from the outside. Whether the door was locked from the inside when Smith fired his shots is not critical to our determination of substantial evidence.

In *People v. Felix* (2009) 172 Cal.App.4th 1618 (*Felix*) – on which both parties rely – the defendant threatened to kill the intended victim, then armed himself with a firearm, drove to the intended victim's house, and parked outside what the defendant knew to be the master bedroom. From close range and with the glow of the television "visible," the defendant fired two gunshots into the master bedroom window. (*Id*. at pp. 1625-1626.) After fleeing, the defendant called and asked if he had harmed anyone. (*Id*. at p. 1626.) The court of appeal concluded not only that this evidence was sufficient to support a finding of specific intent to kill the victim, but that "the reasonableness of the jury's finding that intent to kill was present is *beyond dispute*." (*Ibid.*, italics added.)

Here too, Smith threatened to kill Krystal L., armed himself with a firearm, went to the victim's house, and stationed himself outside what he knew to be the victim's front door; after knocking and banging on the door and telling her to open it, he fired six gunshots into the home, including five through the door (two of which were just below the peep hole) to which he called her, and one through the wall towards the living room. And after fleeing the scene, he called the victim. As in *Felix*, substantial evidence supports the conclusion that Smith intended to kill.

Smith urges that the decision in *Felix* is distinguishable, and even supports his argument that the evidence of his intent was insufficient, because the court in *Felix* noted that a "glow" from the television was "visible," while there was no evidence that Smith could see a glow from Krystal L.'s television, a light in her window, or other indication Krystal L. was home.

Smith's argument is not persuasive. Although *Felix* did note that the "glow" from the television was "visible," *Felix* did not hold that an intent to kill could not have been found without that circumstance.[5] The point in *Felix* was simply that there was evidence

_____

[5]     Indeed, the visibility of the television's glow in *Felix* appears to be an inference drawn from the victim's testimony that he had turned on the television and there were windows (one of which was blocked by a dresser) in the bedroom. (*Felix, supra*, 172 Cal.App.4th at p. 1623.) Here too, Krystal L. testified that she

10

from which a jury could reasonably infer that the defendant harbored an intent to kill when he fired into the bedroom; in this case there was also ample evidence, albeit different evidence, from which a jury could reasonably infer that Smith intended to kill Krystal L. when he fired through her front door.

Smith also argues that, although his threat to "pop" Krystal L. may have shown an intent to kill, there was no evidence that he believed he could achieve that objective by shooting through her door, since their last conversation was 45 minutes earlier, they used cell phones (so she was not necessarily at home), and Krystal L. did not respond when he banged on her door. Smith urges that he had reason to believe Krystal L. had fled.

By this argument, Smith merely contends that the jury should have reached a different inference from the evidence. On appeal, we do not reweigh the evidence, but determine whether there was substantial evidence to support the inference the jury did make. (*Felix, supra*, 172 Cal.App.4th 1626.) Smith fails to establish error.

B. *Assault With a Firearm*

Smith next contends there was insufficient evidence to support his conviction for assault with a firearm, again because, in his view, there was no evidence that he knew Krystal L. was inside her apartment when he fired five shots through the door and one through an adjacent wall. Again, we must disagree.

1. *Law*

A conviction for assault with a firearm (§ 245, subd. (a)(2)) requires proof of the crime of assault, plus proof that it was accomplished by the use of a firearm. An assault

---

was watching television in the living room, with the volume so loud that she could not hear what Smith said, and that she did not even hear the gunshots. Krystal L. also claimed at trial that she did not respond to the banging on the door because neighbors sometimes complained about Krystal L.'s dog, suggesting that noises from her apartment could be heard outside her apartment. A reasonable inference is that the sound of Krystal L.'s television was audible to Smith, just as the glow of a television was visible to the defendant in *Felix*. (While there was no direct evidence that Smith heard Krystal L.'s television, *Felix* did not mention any direct evidence that the defendant had noted the glow.) We need not rely on this inference in concluding that substantial evidence supports the verdict here.

is "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (§ 240.) Assault requires only an intentional act and "actual knowledge of those facts sufficient to establish that the act by its nature will probably and directly result in the application of physical force against another." (*People v. Williams* (2001) 26 Cal.4th 779, 790.) Furthermore, a defendant may be guilty of assault even if he believed the act was not going to result in the infliction of force on another, if "a reasonable person, viewing the facts known to defendant, would find that the act would directly, naturally and probably result in a battery." (*Id.* at p. 788, fn. 3.)

The question, therefore, is whether there is substantial evidence to support an inference that Smith knew facts that would lead a reasonable person to believe firing through Krystal L.'s door would probably and directly result in physical force against her.

### 2. *Application*

Substantial evidence supported Smith's conviction. He threatened Krystal L. on the phone and told her he was going to "come *up there*" to "pop" her, to which she replied "come over here then." (Italics added.) He proceeded up to Krystal L.'s second floor apartment, where he knew she lived, and knocked or banged on the door and told her to open it, indicating his belief that she was there despite her silence. Then he fired twice through the front door below the peep hole, where the bullets could strike an adult who had come to the door in response; he fired additional rounds through the door, all of which could have penetrated the closet wall and struck someone in the bedroom or hallway; and he fired through an adjacent wall, towards the living room. (See *Felix, supra,* 172 Cal.App.4th at pp. 1623, 1627-1629 [assault with a firearm upon victim's children sustained where defendant knew it was highly likely the children were in the house based on facts known to him, including familiarity with house and time of attack].)

Smith's reliance on *People v. Navarro* (2013) 212 Cal.App.4th 1336, is misplaced. There, the defendant was convicted of assault with a semiautomatic firearm after he argued with his wife, went to his car, retrieved a loaded gun, and fired a bullet at a door through which she had just walked. (*Id.* at pp. 1342, 1345.) The court found the

12

evidence *sufficient* to support the conviction, concluding that the defendant had all the facts necessary to lead a reasonable person to understand that a battery would directly, naturally, and probably result. (*Id*. at pp. 1345, 1347.) Smith points out that in this case, he did not see Krystal L. walk through the front door of her apartment. But *Navarro* merely held that seeing the victim walk through the door was sufficient evidence, not that it was required evidence. Just as the facts known to the defendant in *Navarro* supported the conclusion that a battery was the direct and probable result of his actions, the facts known to Smith in this case were sufficient as well.

C. *Child Endangerment*

Smith next contends that his conviction for child endangerment (§ 273a, subd. (a)) must be reversed because there was no evidence that he knew the child – Krystal L.'s son – was in the apartment. He is incorrect.

1. *Law*

Section 273a, subdivision (a) authorizes criminal punishment for: "Any person who, under circumstances or conditions likely to produce great bodily harm or death, willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any child, willfully causes or permits the person or health of that child to be injured, or willfully causes or permits that child to be placed in a situation where his or her person or health is endangered."

A defendant is guilty of violating section 273a, subdivision (a) if his conduct is willful and is committed under circumstances or conditions likely to produce great bodily harm or death. (*People v. Sargent* (1999) 19 Cal.4th 1206, 1216 [direct infliction of abuse].) Where, as Smith asserts here, the harm to the child is inflicted indirectly, the required mental state is criminal negligence. (*People v. Valdez* (2002) 27 Cal.4th 778, 788-789.) Criminal negligence is aggravated, culpable, gross or reckless conduct that is such a departure from that of the ordinarily prudent or careful person under the circumstances as to be incompatible with a proper regard for human life. (*Id*. at p. 783.) A defendant may be criminally negligent if a reasonable person in his or her position would have been aware of the risk. (*Ibid*.)

13

The question here, therefore, is whether there was substantial evidence to support the conclusion that a reasonable person in Smith's position would have been aware of a risk of great bodily harm or death to Krystal L.'s son when he fired his gun into Krystal L.'s home.

### 2. *Application*

Substantial evidence supports Smith's conviction. Smith willfully fired multiple times into Krystal L.'s apartment. Since he had been dating Krystal L. for six months, and they had known each other for two years, a rational inference is that he fired those shots knowing that Krystal L.'s son usually lived with Krystal L. in that apartment. Indeed, during the school week, her son stayed with Krystal L. "most of the time." Furthermore, Smith's attack came in the evening hours when the eight-year-old would likely be at home, and Smith fired not just around the door's peep hole, but lower as well. And given Smith's relationship with Krystal L. and his familiarity with where she lived, it would be reasonable to conclude that he knew the sole bedroom in Krystal L.'s abode was behind the closet, in the path of the bullets he was firing through the door.

Smith argues that the evidence was insufficient because there was no evidence he knew *Krystal L.* was home, and "a fortiori he did not know that [Krystal L.'s son] was home." This argument fails because, as stated *ante*, there was indeed sufficient evidence to support the conclusion that Krystal L. was home. Smith also points to Krystal L.'s claim at trial that her son sometimes stayed with others. But it is not our role to reweigh the evidence or to assess the credibility determinations of the jury. Our task is to determine whether there is substantial evidence to support the verdict; for the reasons stated, there was.

### D. *Ineffective Assistance/Prosecutorial Misconduct*

Smith contends his defense counsel did not provide effective assistance of counsel because he did not object to the prosecutor's argument that an "abiding conviction," in the context of a reasonable doubt instruction, was something the jurors must have "right there and then" when they are deliberating "today, tomorrow, this week." Smith urges that the prosecutor's argument constituted prosecutorial

misconduct because it "trivialized and diluted the reasonable doubt standard as a transitory feeling a juror has during the course of deliberations, without regard for how he or she will feel about the decision in the future," and thus lessened the prosecution's burden of proof.  (See *People v. Williams* (2009) 170 Cal.App.4th 587, 635 [improper for prosecutor to misstate the law or attempt to lower burden of proof].)

### 1. *Prosecutor's Statement*

For context, we begin with what *defense* counsel told the jury.  In closing argument, counsel observed that, according to the jury instructions, "proof beyond a reasonable doubt has to be an abiding conviction."  Counsel then purported to define an abiding conviction as follows:  "That's a word that I don't use every day, but it's something that you look over to the prosecution and say, prove it to me.  This person that you're saying did this, my significant other, my mother, my friend, my roommate, whatever, I know them to be innocent, now you prove it to me.  So I have an *abiding conviction that when I wake up tomorrow, a year from now, ten years from now, twenty years from now and I become more educated about the system or not, that my conviction is abiding enough that I know I made the right decision*.  [¶] Those are strong languages [sic] that's in the instruction that you need to follow.  It's the highest standard there is.  It's the highest standard there is."  (Italics added.)

On rebuttal, the prosecutor responded to defense counsel's statement about "abiding conviction" as follows:  "Because hundreds of jurors, hundreds of jurors, some of you, yourself, hundreds of jurors, have been using this standard for a couple hundred years.  Thousands, hundreds of thousands of jurors have sat where you sit and have been asked to look at what reasonable doubt is.  Look at innocence and guilt.  *Look at all the law and interpret that for yourselves*.  [¶] Now, when we talk about an abiding conviction, nowhere in the law does it say an abiding conviction is something where you reflect upon what you did ten years from now or five years from now.  *What an abiding conviction is is when you're back there deliberating, that's your abiding conviction, right there and then.  We're not asking about tomorrow.  We're not asking about once you get*

15

*older, once you have more life experience. [¶] No, no. There, today, tomorrow, this week, the way you feel, the way you deliberate.*" (Italics added.)

Because defense counsel did not object to this argument at the trial, we consider whether the argument constituted prosecutorial misconduct in the context of whether counsel's failure to object constituted ineffective assistance.

### 2. *Ineffective Assistance Claim*

To establish ineffective assistance of counsel, Smith must demonstrate both that his counsel's performance was deficient and that Smith suffered prejudice as a result. (*Strickland v. Washington* (1984) 466 U.S. 668, 687- 688, 691-692.)

### a. *performance*

Smith argues that his defense attorney should have objected to the prosecutor's statement concerning an "abiding conviction," because the prosecutor was wrong when he said that an "abiding conviction" is "when you're back there deliberating." To the contrary, Smith urges, an "abiding conviction" in this context means that the juror's belief in the truth of the charge must be "both long lasting and deeply felt" or of a "lasting, permanent nature." (*People v. Light* (1996) 44 Cal.App.4th 879, 885; *People v. Brigham* (1979) 25 Cal.3d 283, 290-291.) The word "abiding" indicates "how strongly and how deeply [the juror's] conviction must be held." (*Brigham*, *supra*, at pp. 290-291.) It means that the belief is "settled and fixed, a conviction which may follow a careful examination and comparison of the whole evidence." (*Hopt v. Utah* (1887) 120 U.S. 430, 439; *Victor v. Nebraska* (1994) 511 U.S. 1, 14-15.)

In our view, the prosecutor's statement was not clear, and was therefore not clearly misconduct. Perhaps his statement could be interpreted to mean, as Smith now suggests, that an abiding conviction must merely be something you feel or believe at the moment, and it therefore does not have to be long-lasting or permanent. On the other hand, the prosecutor's statement could also be interpreted to mean, as respondent essentially asserts, that jurors should not speculate about what they might think years from now after having different life experiences, but must focus instead on what they believe at the time they are deliberating in the jury room. This is the better interpretation

16

in light of the defense arguments to which the prosecutor was responding; and certainly the prosecutor never argued that the jury's belief did not have to be strongly or deeply held, or that the jury did not have to carefully analyze the evidence. Because of the vague and fleeting nature of the prosecutor's comment, we see no possibility that it rendered the trial fundamentally unfair, or any reasonable likelihood that the jury would understand the statement in a way that would lead it to convict Smith using a standard lower than proof beyond a reasonable doubt. For that reason, we question whether it was incompetent for defense counsel not to object; moreover, as we discuss next, the failure to object was not prejudicial.

### b. prejudice

To demonstrate prejudice, it is Smith's burden to show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*People v. Ledesma* (1987) 43 Cal.3d 171, 217-218.) A reasonable probability in this context is "a probability sufficient to undermine confidence in the outcome." (*Id*. at p. 218.)

Smith fails to establish prejudice. The trial court provided the jury with the standard reasonable doubt instruction in CALCRIM No. 220, which reads in part: "A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt. [¶] Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt." The jury was further directed to rely on the court's instructions. (CALCRIM No. 200.) During their deliberations, the jurors also had written copies of CALCRIM No. 220 (reasonable doubt), CALCRIM No. 222 (evidence), CALCRIM No. 223 (direct and circumstantial evidence), and CALCRIM No. 224 (circumstantial evidence: sufficiency of evidence). It is well-established that "[j]urors are presumed to understand and follow the court's instructions." (*People v. Holt* (1997) 15 Cal.4th 619, 662.)

17

In this case – where the prosecutor's statements were fleeting, susceptible to different interpretations (including one that is not erroneous), and counterpointed by the defense counsel's definition of "abiding conviction" – the jury instructions sufficiently minimized any prejudicial effect from the prosecutor's statement. Smith has not established that counsel's failure to object was prejudicial. (See *People v. Nguyen* (1995) 40 Cal.App.4th 28, 36-37 [failure to object to prosecutor's remark trivializing reasonable doubt standard was not prejudicial, where prosecutor also directed the jury to read the instruction and the jury was correctly instructed].)

E. *Factors in Imposing the Upper Term Sentence for Attempted Murder*

Smith seeks a remand for resentencing, on the ground that the court relied on improper aggravating factors in imposing the upper term on his count one attempted murder conviction, and his trial attorney did not object. His argument has no merit.

1. *Probation Report*

The probation officer's report and sentencing recommendation set forth eight factors in aggravation: (1) the crime involved the threat of great bodily harm and acts disclosing a high degree of viciousness, in that Smith fired into Krystal L.'s apartment numerous times and her son was inside (Cal. Rules of Court, rule 4.421(a)(1)); (2) Smith was armed with a weapon at the time of the commission of the crime (rule 4.421(a)(2)); (3) the victims were vulnerable and unarmed (rule 4.421(a)(3)); (4) the manner in which the crime was carried out indicated planning, sophistication, or professionalism (rule 4.421(a)(8)); (5) Smith engaged in violent conduct which indicates a serious danger to society, and Smith has a prior conviction for robbery (rule 4.421(b)(1)); (6) Smith's prior convictions as an adult and sustained petitions in juvenile delinquency proceedings are numerous and of increasing seriousness (rule 4.421(b)(2)); (7) Smith was on probation when the instant crimes were committed (rule 4.421(b)(4)); and (8) Smith's prior performance on probation was unsatisfactory (rule 4.421(b)(5)).

In addition, the probation report noted, Smith "has been involved with the criminal justice system since he was a juvenile and at the time of the present offense he was on three felony probation grants as an adult," and he has demonstrated that he is a

18

"danger to society and that he has not changed his ways after being placed on felony probation."

## 2. *Sentencing Hearing*

At the sentencing hearing, the court expressed its view of the seriousness of Smith's crime(s), his criminal record, and the danger he posed to the community. The court stated: "[T]he crime that [Smith] committed was a very, very serious crime, a very, very dangerous crime. The fact that Miss Krystal L. didn't get killed and the fact that the young child inside the house didn't get killed is just a matter of fortuity and the path that the bullets took that night. And that's really all that that prevented them from being killed. Nothing else. [¶] So the facts of the case are not good at all." The court continued: "[Smith] has a record that is not good either. . . . [A]t his young age, he has a robbery conviction, he has a 236, which is a human trafficking conviction, he has a 12021 gun conviction, and a number of juvenile findings." The court concluded: "So the idea that he presents a clear danger to the community is, one, I think, certainly has a substantial amount of weight behind it. [¶] I looked at his prior convictions. I looked at some of the facts surrounding them. And they're not good. And the facts of this case are not good."

In imposing the upper term for attempted murder, the court then stated: "The Court has selected that term in light of, *among others*, the following facts. That the *crime committed in this case was a particularly callous and violent one*, and that *the defendant was armed* during the commission of the crime, also facts relating to the other facts and circumstances in terms of the *endangering of the victim and the potential danger to the victim and the other child in the house – or the child, the young child* in the house. So the court has selected the aggravated term of nine years." (Italics added.)

## 3. *Law*

The selection of the term of sentence rests with the discretion of the trial court. (§ 1170, subd. (b).) The court may consider circumstances in aggravation or mitigation and any other factor reasonably related to the sentencing decision. (Cal. Rules of Court,

19

rule 4.420(b).) Factors in aggravation include the defendant's violent conduct that indicates he or she poses a serious danger to society, numerous prior convictions as an adult or sustained petitions in juvenile delinquency proceedings, and prior prison terms. (Rule 4.421(b).) Moreover, an aggravating circumstance is not limited to the factors listed in the California Rules of Court, but may simply be a circumstance that makes the offense " 'distinctively worse than the ordinary' " and renders the defendant "deserving of punishment more severe than that merited for other offenders in the same category." (*People v. Black* (2007) 41 Cal.4th 799, 817 (*Black*).) Nonetheless, the court cannot use the same fact both to aggravate the base term and to impose an enhancement, or use a fact constituting an element of the offense to aggravate or enhance a sentence. (*People v. Scott* (1994) 9 Cal.4th 331, 350; § 1170, subd. (b); Cal. Rules of Court, rule 4.420(c), (d); *People v. Moberly* (2009) 176 Cal.App.4th 1191, 1197.)

Because one factor in aggravation suffices for imposition of the upper term, no remand is required if there is at least one valid factor supporting it. (*Black*, *supra*, 41 Cal.4th at p. 813; *People v. Forster* (1994) 29 Cal.App.4th 1746, 1759.)

### 4. *Smith's Forfeiture or Waiver*

Because defense counsel did not object to the imposition of the upper term based on the facts stated by the court, the issue is forfeited. (*People v. DeSoto* (1997) 54 Cal.App.4th 1, 7-8.) We nonetheless turn to the merits of his argument in light of his claim that his counsel's failure to object constituted ineffective assistance of counsel.

### 5. *Sufficiency of the Factors Cited By the Court*

Smith contends the court's concern that "the crime committed in this case was a particularly callous and violent one" was insufficient to support the imposition of the upper term, because any attempted murder involving discharge of a gun is inherently violent and callous. In addition, Smith urges, the court's observation that he was armed with a gun is insufficient because that fact was used to support an enhancement under section 12022.53, subdivision (c), and the court's remark concerning the endangerment of Krystal L.'s son was insufficient because it too was based on his firearm use.

20

Smith's argument is unconvincing. Although the fact that Smith discharged a firearm in his attempt to murder Krystal L. cannot be used to support an upper term because that fact was used to enhance his sentence under section 12022.53, subdivision (c), the court can rely on the separate fact that Smith did not merely fire once through Krystal L.'s door – which would be sufficient for application of the enhancement – but fired *multiple* times, thereby increasing the violence and danger to human life and property in a manner beyond what would be required for imposition of the enhancement.

Similarly, Smith's crime could reasonably be considered to be unusually serious because he fired multiple times *blindly* through the door of Krystal L.'s home. While the jury necessarily determined that Smith believed Krystal L. was at home and there was a risk of harm to Krystal L.'s son in convicting Smith of the charged offenses, Smith could well have injured anyone else who happened to be in the residence, too. In short, there were facts concerning Smith's crime that transcended what would be necessary to constitute an attempted murder with a firearm, and which made Smith deserving of greater punishment than other perpetrators of the same offense. (*Black, supra,* 41 Cal.4th at p. 817.)

Moreover, the court at the sentencing hearing also expressly mentioned Smith's criminal history (and, indeed, the minute order discloses that the imposition of the upper term was based in part on Smith's prior convictions). Smith's criminal past included four juvenile dispositions, an adult conviction for felony robbery in 2008, an adult conviction for felony human trafficking in 2009, and an adult conviction for felony possession of a firearm by a felon in 2010. Although the court used the robbery conviction to double Smith's term under the Three Strikes law (and as a prior serious felony to add to his sentence under section 667, subdivision (a)), a conclusion of recidivism, numerous convictions and juvenile dispositions of increasing severity, and several failed stints on probation is readily drawn from the rest of Smith's criminal history, and from his criminal history as a whole.

The court's imposition of the upper term was supported by the record.

21

F. *Facts in Imposing the Upper Term Sentence for Assault With a Firearm*

On the count two assault with a firearm under section 245, subdivision (a)(2), the court sentenced Smith to the upper term of four years (doubled for the prior conviction), plus four years for the personal use of a firearm enhancement under section 12022.5, subdivision (a), and then stayed the sentence pursuant to section 654. (See § 12022.5, subd. (d).) In imposing the upper term, the court stated: "Again, for the record, the Court selects that upper term given what the Court perceives to be a *callous and violent nature of the crime due to the fact that defendant was armed during this commission*." (Italics added.)

Smith contends the court erred in imposing the upper term on the ground that the crime was callous and violent due to the fact Smith was armed, because arming is an element of the offense of assault with a firearm. (Smith forfeited this argument by failing to object in the trial court; nevertheless, we consider it in light of his further contention that counsel's failure to object constituted ineffective assistance.)

We find no error, and thus no prejudice in counsel's failure to object. In context, the court's reference to Smith being "armed" reflected not the mere fact that Smith had or used a firearm, but the *manner* in which he used it and his reason for using it: namely, Smith fired his gun multiple times, shooting at particular angles and directions towards the door from outside the apartment in the building hallway, as his chosen response to the relatively minor event of an argument with his girlfriend. These additional circumstances supported the imposition of the upper term.

At any rate, even if the court had improperly engaged in the dual use of a fact to support the upper term sentence, reversal would not be required because there is no reasonable probability Smith would receive a lesser sentence upon remand (*People v. Avalos* (1984) 37 Cal.3d 216, 233) and no prejudice arose from counsel's failure to object. As noted *ante*, the probation report lists multiple additional aggravating circumstances that would independently support the upper term, including Smith's past criminal history that the court expressly noted at the sentencing hearing.

Smith argues that the facts that he was only 21 years old, was raised in foster care, and had never served a prison term, make it possible that the court would not have chosen the upper term if it had not relied on the fact that Smith was armed. The record, however, overwhelmingly suggests the contrary: the court noted Smith's youth but concluded that his past record and the circumstances of the crime nonetheless warranted the upper term.

G. *Failure to Stay Sentence on Count Three (Shooting at Inhabited Dwelling)*

Smith contends his sentence for shooting into an inhabited dwelling (§ 246) should have been stayed because the conduct underlying that crime was the same as the conduct underlying his conviction for attempted murder, and the two crimes were committed as part of an indivisible course of conduct. We agree.

Section 654, subdivision (a) provides in part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."

Section 654 precludes multiple punishments for a single act and for an indivisible course of conduct. (*People v. Hester* (2000) 22 Cal.4th 290, 294.) " 'Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor.' " (*People v. Norrell* (1996) 13 Cal.4th 1, 6.) Thus, section 654 precludes multiple punishment where multiple offenses were committed incident to a single intent and objective. (*People v. Gaio* (2000) 81 Cal.App.4th 919, 935.) On the other hand, " '[I]f the evidence discloses that a defendant entertained multiple criminal objectives which were independent of and not merely incidental to each other, the trial court may impose punishment for independent violations committed in pursuit of each objective even though the violations shared common acts or were parts of an otherwise indivisible course of conduct.' [Citations.]" (*People v. Nubla* (1999) 74 Cal.App.4th 719, 730.)

Whether there was more than one independent criminal objective is a matter we review for substantial evidence. (*People v. Osband* (1996) 13 Cal.4th 622, 730.) Although Smith's counsel did not object in the trial court, the purported error would

23

constitute an unauthorized sentence and is therefore not subject to waiver. (*People v. Le* (2006) 136 Cal.App.4th 925, 931.)

Smith argues that, according to the prosecution, his intent when firing through the front door of Krystal L.'s apartment was to kill her. Thus, the same conduct and the same objective supported both his conviction for attempted murder, and his conviction for shooting at an inhabited dwelling. He therefore cannot be punished for both.

Respondent's only argument to the contrary is that, essentially, Smith had two successive objectives when he fired through Krystal L.'s front door: when he first shot through her door, his objective and intent was to kill Krystal L.; when he fired additional shots, his objective and intent was to willfully and maliciously shoot at her dwelling. Respondent explains that, although Smith could have stopped firing after his first shot, he continued to shoot five more times, and because he was using a revolver, he had time to reconsider his actions between each of his shots, some of which targeted different locations. Respondent argues that, where the offenses are "'separated by periods of time during which reflection was possible,'" section 654 does not prohibit multiple punishment. (*People v. Surdi* (1995) 35 Cal.App.4th 685, 689 (*Surdi*); see *People v. Trotter* (1992) 7 Cal.App.4th 363, 368 (*Trotter*).) Furthermore, respondent argues, a person who fires a revolver six times into an apartment can reasonably be considered more culpable than a person who fires only once; therefore, to effectuate section 654's purpose to make punishment commensurate with criminal liability, Smith should be punished for both convictions since he could have walked away after one shot but chose to willfully and maliciously continue to fire blindly into the residence. (See *Trotter, supra*, 7 Cal.App.4th at pp. 367-368.)

As Smith points out, however, the court in *Surdi* stated that the stabbing episodes at issue in that case were "separated by *considerable* periods of time during which reflection was possible," as well as "a break in the action." (*Surdi, supra*, 35 Cal.App.4th at p. 689, italics added; cf. *Trotter, supra,* 7 Cal.App.4th at p. 366 [defendant could be punished for each of three shots at a police car, where the second shot came a minute after the first, and the third shot came moments after the second, because each shot

required a separate trigger pull, all three shots were volitional and calculated, and the shots were "separated by periods of time during which reflection was possible"].) Smith urges that there was no evidence that his shots were separated by a considerable period of time for reflection.

We agree with Smith on this point. Substantial evidence did not support the conclusion that Smith harbored an objective when he fired the first shot or shots through Krystal L.'s door that was different from his objective when he fired the remaining shots through Krystal L.'s door. There was no testimony that the shots were fired at significantly different times or with any appreciable time gap in between. Nor was there evidence that Smith possessed an intent to shoot at Krystal L.'s apartment except for the purpose of striking her.[6] To the contrary, the evidence was that he threatened to kill Krystal L., and carried out *that* intent by bringing a firearm to her apartment and shooting at her door and adjacent wall after calling out to her. Indeed, the prosecutor did not argue at trial that some of the shots were attributable to his objective of killing Krystal L. and some were for the purpose of simply shooting her home. And while Smith's decision to fire multiple times into Krystal L.'s apartment did increase his culpability, that increase in culpability is accounted for by the imposition of the upper term on counts one and two. The sentence on count three for shooting at an inhabited dwelling should have been stayed.

## III.  DISPOSITION

The judgment is modified such that the sentence of three years four months for violation of Penal Code section 246 is stayed pursuant to Penal Code section 654. As so modified, the judgment is affirmed.

---

[6]     According to Deputy Corvello, Krystal L. said that Smith's threats included a threat about "shooting the house." However, the transcript of Smith's conversation with Krystal L. does not mention an intent to shoot her house, but to "pop [her] Bitch ass," to "kick [her] shit in," and to "smoke that nigga . . . bitch."

_____

NEEDHAM, J.

We concur.

_____

JONES, P. J.

_____

BRUINIERS, J.