Filed 7/28/15  P. v. Rodriguez CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>RAUL PEREZ RODRIGUEZ,<br><br>    Defendant and Appellant. | H040074<br>(Santa Cruz County<br>Super. Ct. No. F21710) |

Defendant Raul Perez Rodriguez was found guilty of premeditated attempted murder committed for the benefit of a criminal street gang.  On appeal, defendant argues there was insufficient evidence to support the jury's finding of premeditation and the gang enhancement.  In addition, defendant argues the trial court erred in failing to instruct the jury on voluntary intoxication as it related to his claim of imperfect self-defense.

## STATEMENT OF THE FACTS AND CASE

On October 23, 2011, the victim in this case, Victor Salazar Garcia was living on Bixby Street in Santa Cruz.  Salazar Garcia stated that he lived in Sureño territory, but he was not in the gang.  That night, Salazar Garcia had gone to Watsonville with his family, and when he returned around 8:00 p.m., he found another car parked in his parking spot.  His family got out of his car and went into the house, and Salazar Garcia waited in the car for the person in his space to move.  When the driver of the car came out to move his car, Salazar Garcia backed his own car out and over the sidewalk on the other side of the

street.  Salazar Garcia sat in the driver's seat of his car with the windows down while he smoked a cigarette.

While sitting in his car smoking, Salazar Garcia saw defendant walking toward him.  Since Salazar Garcia was blocking the sidewalk, he tried to move his car out of way, but had to brake suddenly when another car drove by.  At that point, defendant said, "Puro Norte.  Te voya cargar la chingada."  Salazar Garcia knew that "Puro Norte," was a gang slogan, and understood the remaining statement to mean "[h]e's going to kill me."  The Spanish interpreter stated that this phrase means "I'm going to fuck you up."

While defendant was verbally threatening Salazar Garcia, he stabbed Salazar Garcia through the open car window with a knife he was holding in his left hand.  Salazar Garcia said there was no verbal altercation before the attack, and that he said "What's happening? What's going on?" to defendant.  Salazar Garcia tried to grab the knife as defendant was attempting to stab him a third time, but ended up cutting his hand.  Salazar Garcia then let go of the brake and pushed the accelerator, crashing his car into the fence and stairway of his apartment across the street.

Salazar Garcia got out of his car and was bleeding and having trouble breathing.  Salazar Garcia shouted at defendant, "Que onda, hijo de puta madre," which means, "What's up you son of a bitch?"  At this point, Salazar Garcia's wife came out of the house, and saw defendant walk away while yelling, "Puro Norte, faggot."  She said defendant was wearing white tennis shoes, white socks, black clothing, and a black cap.

When Santa Cruz Police Officer Karina Cecena arrived, she saw Salazar Garcia sitting on the ground with his shirt off.  He was using a blue shirt to apply pressure to his chest wound.  Officer Cecena looked inside Salazar Garcia's car and found blood on the seat, steering wheel, window and door.  She also found Salazar Garcia's brownish cap with a blue star that is associated with the Dallas Cowboys inside the car.

Salazar Garcia was taken by ambulance to Dominican Hospital and then by air to Santa Clara County Valley Medical Center.  He had two stab wounds to his chest, one on

2

his shoulder and three or four on his left hand. One of his fingers required surgery. The chest wounds were just below Salazar Garcia's collar bone, and one or both penetrated his chest wall and caused his lung to collapse. The chest wounds were potentially lethal without treatment.

A subsequent investigation by Detective Michael Hedley of the Santa Cruz Police Department revealed fingerprints belonging to defendant inside Salazar Garcia's car. Detective Hedley also found a metal watch on the floorboard of the driver's side of Salazar Garcia's car. There was blood on the watchband. Detective Hedley discovered DNA from two sources on the watch: defendant and Salazar Garcia. Detective Hedley learned that defendant was on parole, and contacted defendant's parole officer, Edward Garcia. Detective Hedley and Garcia went to defendant's residence to conduct a parole search, but defendant was not there. Garcia asked defendant's family to have defendant contact him. Defendant did not contact Garcia over the next several days, which Garcia found to be unusual for defendant.

Garcia and the police arrested Salazar Garcia a few days later at a Motel Six in Gilroy. During the arrest, officers seized a cell phone from defendant's room. One text message on the phone referred to playing games and "shooting scraps." "Scraps" is a derogatory term for Sureño gang members. Another text message sent after the attack on Salazar Garcia referred to "crashing with [my] homies."

After the arrest, Detective Hedley interviewed defendant. Defendant denied having a cell phone, and said the phone the police had taken belonged to his girl, "Marivel." Defendant told Hedley he did not know why the Santa Cruz Police wanted to talk to him, that he had not been in Santa Cruz the previous week, had not lost a watch, had not stabbed a man, and had not been "banging."

When defendant was being processed after his arrest, authorities noted that he had a huelga bird tattoo on his stomach, a tattoo that read Norteño on his stomach, a tattoo that read "NSW" on his chest, a "X4" tattoo under the "NSW" tattoo on his chest, a tattoo

3

that read "Watson: In amigos we trust" on his back, and a tattoo of a set of red lips on his neck.

When defendant was booked into Santa Cruz County Jail he requested he be classified and placed with "Northerners." Santa Cruz County Jail personnel place Norteño members in the "N-Unit," where defendant was placed on his request. While defendant was in custody, he received a new tattoo of a huelga bird on his neck.

During trial, Santa Cruz Police Detective Lauren Schonfield testified as an expert on Santa Clara County gangs. She stated that Norteños and Sureños commit crimes such as vandalism, drug sales, arson, stabbings, robbery, attempted homicide and homicide.

Only gang members have gang-related tattoos. Sureños associate with the number 13, and have adopted the color blue. Norteños use the number 14 and the color red.

Sureños have areas of "turf" that they control in Santa Cruz. There have been several incidents of violence between Norteños and Sureños in areas of Santa Cruz controlled by Sureños. Many of these incidents involved cars and multiple Norteños, however, there are also cases where a gang member acted alone. When a gang member acts alone it is called a "jale," or mission, and it is often done by a younger gang member to gain status in the gang. During a jale, a gang member may not wear gang colors and would use a knife in order to make less noise and draw attention to the crime. By saying "Puro Norte, puto," a Norteño gang member would advertise to the Sureño neighborhood that this was a Norteño crime.

Detective Schonfield further stated that when a Norteño enters Sureño turf in Santa Cruz and commits a crime, the Norteño has "disrespected [the] turf," and it does not matter if the victim is actually a Sureño member. By doing this, the Norteño is saying to their fellow gang members, "I wasn't afraid of those Sureños. I went in and committed this crime. We don't need to be afraid of them." In addition, she stated that at

4

times, gang members commit crimes against others they believe are members of a rival gang based on clothing alone.

Watsonville Police Detective Jarrod Pisturino also testified as a gang expert. Norteños are the main gang in Watsonville, with at least 1500 members there. Watsonville had a number of Norteño subgroups, including City Hall Watson, North Side Chicos, Watson Varrio Norte, Clifford Manor Locos, and North Side Watson. Norteños associate with the color red and the letter "N." They also use the huelga bird as one of their symbols. Norteños often have tattoos, and only gang members are permitted to have gang tattoos. If non-gang members have tattoos, they may be beaten, stabbed or murdered.

Detective Pisturino testified that defendant is a member of North Side Watson, and committed a gang-related carjacking in 1995, and a gang-related robbery in 2006. Detective Pisturino believed that defendant was an active Norteño based on the fact that defendant had gang-related tattoos associated with Norteños, including the heulga bird and the word Norteño on his stomach, the letters "NSW" on his chest (referring to North Side Watson), and the red lips on his neck (referring to being "kissed" by the Norteño lifestyle). In addition to the tattoos, other factors led Detective Pisturino to conclude that defendant was a Norteño including the fact that he shouted "Puro Norte" after the stabbing, Salazar Garcia was wearing a blue shirt and Dallas Cowboys hat and defendant may have believed him to be a Sureño, the gang-related text messages on defendant's phone such as "shooting scraps," and "crashing with my homies," defendant's admission to jail personnel that he was a "Northerner," and his placement in the "N Unit" in the jail.

Defendant testified at trial. He said that he grew up in Watsonville, and when he was 13 or 14 he became involved with the Norteño gang. He eventually became a Norteño and was "jumped in," meaning he was beaten up by other gang members. When he was 13 or 14 he got his first tattoo of a cross with a "14" on his left hand. He got other gang tattoos before he was 19, including one on his back that said "Watson." In 1995,

5

defendant was convicted in Santa Cruz County of carjacking and felony assault with force likely to cause great bodily injury. Defendant testified that the carjacking was gang-related, and that he did commit gang crimes, but that he never had to commit a crime for his gang.

Defendant was sentenced to prison in 1995 and stayed there until 2005. When he was released, he went back to Watsonville to live with his parents. In 2006 he met Marivel Rodriquez, and that same year he was convicted of felony assault with force likely to produce great bodily injury. Defendant admitted that this was gang-related. Defendant went back to prison where he stayed until 2007. While in prison, defendant had "Norteño" tattooed across his chest. Defendant was not involved in gang activity after he was released in 2007.

In 2008 defendant and Marivel were married and their son Raul was born in 2009. In 2010, defendant returned to prison on a parole violation. He was released in October or November 2010 and returned to Watsonville. Defendant and Marivel found a place to live in Watsonville in January 2011.

During the time he was living with Marivel in 2011, defendant was not hanging around with gang members at all. Defendant was spending time with his family and eventually got a job at Surf City Smoothies in Watsonville. When he was not working, defendant was at home and drinking, but said that the drinking "got like addicting, pretty much." Defendant lied to his parole officer and told him he was living with his parents when he was actually living with Marivel. This was a violation of one of his parole conditions.

Defendant's hours at the smoothie shop starting being cut, and he worked in the fields picking strawberries. Defendant said that he was "fad[ing] away" from the gang as many Norteños did at his age (35), and there was no pressure to commit crimes for the gang.

6

Marivel testified that in 2011, defendant was occasionally working and acting as a father and that he was not "gang-banging." Marivel also said that defendant used to be a Norteño, but that she was not sure what his current gang status was.

On October 21, 2011, defendant lied to Marivel and said he was going out to look for a job. Defendant instead went to a barbeque at his cousin Junior Perez's house in Watsonville, and drank a lot when he was there. When defendant came home in the early morning hours of October 22, 2011, Marivel would not let him inside because defendant was intoxicated and she told him to leave. Later that day, defendant went to a car show with Junior and then a family reunion of one of Junior's friend's, where he drank a lot.

Defendant woke up hung over on October 23, 2011, and went back to Junior's house where he drank more alcohol and smoked marijuana. At some point later in the afternoon, defendant and Junior went to a barbeque at one of Junior's friend's houses in Watsonville. Defendant drank non-stop at the barbeque, including lots of beer and six to seven shots of hard alcohol.

Defendant said that he did not remember leaving the barbeque, or where he went when he left. He did not remember being on Bixby Street in Santa Cruz, and whatever street he was on, he was not there to stab or kill anyone. Defendant said that he was "pretty much intoxicated," and did not remember how he got there.

Defendant testified that his first memory of that night was being on Pacific Avenue in Santa Cruz near a Taco Bell and a liquor store. Defendant wanted to try to find a ride back to Watsonville and he needed a phone because he did not have his with him. Defendant wanted to go to the 7-Eleven store that was near the hotel where he used to work so he could use the pay-phone there.

Defendant said that he remembered crossing a bridge, and said, "I just—the first street that I seen, I turned down. Looked kind of dark a little bit, so I just went down the street, and pretty much right there I relieved myself." Defendant did not remember exactly what he was wearing, but said that it was probably a black and white shirt, baggy

7

black pants, and black Nike tennis shoes. Defendant also said that he did not remember wearing a hat.

Defendant thought he was near his old job. He knew that the Beach Flats area of Santa Cruz was Sureño territory, but did not know anything about the gang status of the neighborhood where he was. Defendant said that he was drunk and was stumbling. He was worried because he could see the lights of the Boardwalk and knew he was close to Beach Flats.

Defendant said that at some point he knew that if a Sureño recognized him as a Norteño, he could be killed. Defendant began walking out of the neighborhood. He heard a car and people pass by. Defendant believed these were gang members and he became scared and nervous. Defendant heard a car passing him and then he heard another vehicle "revving" before it pulled in front of him on the sidewalk.

Defendant said that the vehicle was about five feet away from him when he saw the driver. Defendant testified that the car stopped suddenly and he saw the driver looking at him. Defendant said that he "just reacted," and started punching the driver through the open driver's-side window. Defendant said that he remembered punching but did not remember having a knife and could not remember stabbing Salazar Garcia.

Defendant attacked Salazar Garcia first, because he said that his first instinct was to protect himself. Defendant thought he would be shot or killed if Salazar Garcia got out of his car. Defendant said that he felt threatened by Salazar Garcia even thought he did not see a knife or gun and did not recognize Salazar Garcia as a gang member. Defendant did not remember whether Salazar Garcia said anything to him, was wearing a hat, or what color shirt he had on.

Defendant repeated that he felt threatened because "of the way the car got in front of me, and cut me off, and I did not know what was happening. I did not know what was going on. Felt like something was going to happen to me." Defendant said that he was almost run over when Salazar Garcia's car accelerated and crashed across the street.

8

Defendant said that he tried to run because he heard people coming out. Defendant denied that he walked toward Salazar Garcia after the car crashed, but later said that he did not remember whether he followed Salazar Garcia.

Defendant said that he could not run very fast because he was drunk. Defendant did not remember ever saying "Puro Norte, puto."

Defendant said that he remembered waking up on October 24, 2011 at Junior's friend's house where he had attended the barbeque the night before. Defendant did not know Junior's friend's name or the address of the house. Defendant woke up with a hangover, and with dried blood on his hands, pants and shirt. Defendant threw his shirt and pants away. Defendant only remembered that he had been in a fight the previous day.

When defendant picked up his cell phone the next day, he did not call the police or his parole officer, Garcia, to inform them he had been in a fight. Defendant said that he did not remember telling anyone about the fight.

Defendant found out soon after the incident that his parole officer, Garcia, was looking for him. Defendant did not contact Garcia because he was scared. Defendant said, "I knew something was wrong, because of the fact that he tried to contact me right away when he had just seen me, like, a week before that." Defendant believed he "had done something pretty bad, something wrong." Defendant said, "I knew I did something wrong, but I did not know [what]."

Over the next few days, defendant stayed with a number of friends in a number of places. Eventually, defendant met up with Marivel at a hotel in Gilroy where he was arrested.

Defendant testified that he did not know why he lied to Detective Hedley during his interview about not having a cell phone. Defendant said that he had used his cell phone to read about the Bixby Street incident on the Santa Cruz Sentinel Web site.

Defendant said that when he was taken to the county jail, he did not asked to be placed in the "N-Unit," because the staff already knew he was a Northerner. Defendant

9

first testified that he did not remember telling jail personnel that he was a Norteño affiliate, but later remembered that he had. Defendant said that he was not a gang "dropout" when he was arrested, and said that he did not know how to dropout.

While he was in jail awaiting trial, defendant got a huelga bird tattoo to cover up a tattoo of the name of his former girlfriend. Defendant testified that his huelga bird tattoo had no gang association, and that it was only to express pride at being a Mexican farm worker. Defendant said that the huelga bird is the symbol on the United Farm Workers flag. Defendant denied that the huelga bird is associated with Norteños, and said that this is the view of gang experts only.

Later at trial, defendant stated that the United Farm Workers Union flag had a huelga bird with five wings, and that his tattoo of the bird had four wings. Defendant stated that four is the number associated with Norteños. Defendant then admitted that his huelga bird tattoo was a Norteño tattoo.

Defendant said that while he was in jail, Marivel called him and asked him to snitch and cut his ties with the gang. Defendant said that he had not cut his ties with the gang, and he is still an active Norteño. Defendant said that the Norteños are a street gang that commits crimes like attempted murder.

In April 2013, defendant was charged with willful, deliberate, and premeditated attempted murder (Pen. Code, §§ 664/187, subd. (a)).[1] The information also alleged that defendant inflicted great bodily injury (§ 12022.7, subd. (a)), and committed the offense for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)). Finally, the information alleged that defendant had a prior "strike" conviction (§ 667, subds. (b)- (i)), and had served a prior prison term (§ 667.5, subd. (b)).

---

[1] All further statutory references are to the Penal Code.

10

After trial, the jury found defendant guilty of attempted premeditated murder, and found all of the enhancements true. Following a bench trial, the court found defendant had suffered a prior "strike" conviction, and had previously served time in prison.

Defendant was ordered to serve a prison term of 15 years to life, plus a consecutive four-year determinate term. This appeal followed.

**DISCUSSION**

Defendant argues there is insufficient evidence to support the finding of premeditation and deliberation, and the finding that defendant committed attempted murder for the benefit of a criminal street gang.

"The law we apply in assessing a claim of sufficiency of the evidence is well established: ' " ' "[T]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' " ' [Citation.] The standard is the same under the state and federal due process clauses. [Citation.] 'We presume " 'in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citation.] This standard applies whether direct or circumstantial evidence is involved." [Citations.]' [Citation.]" (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 294.)

***Premeditation and Deliberation***

"Like first degree murder, attempted first degree murder requires a finding of premeditation and deliberation." (*People v. Villegas* (2001) 92 Cal.App.4th 1217, 1223, fn. omitted.) " 'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance." (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080.) "An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or

11

rash impulse. [Citations.] However, the requisite reflection need not span a specific or extended period of time." (*People v. Stitely* (2005) 35 Cal.4th 514, 543.)

" ' " 'Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . .' " ' [Citation.]" (*People v. Stitely, supra,* 35 Cal.4th at p. 543.) "The test is not time, but reflection." (*People v. Bloyd* (1987) 43 Cal.3d 333, 348.)

In *People v. Anderson* (1968) 70 Cal.2d 15, 26-27 (*Anderson*), the California Supreme Court described three categories of evidence that can show premeditaton and deliberation: motive, planning activity, and manner of killing. These categories are not exclusive of others or invariably necessary or required. (*People v. Koontz, supra,* 27 Cal.4th at p. 1081.) Nor must they "be present in any particular combination to find substantial evidence of premeditation and deliberation. [Citation.] 'However, [w]hen the record discloses evidence in all three categories, the verdict generally will be sustained.' [Citation.]" (*People v. Stitely*, *supra,* 35 Cal.4th at p. 543.)

Defendant argues that the evidence in this case does not satisfy the *Anderson* framework, because there was little evidence of motive, scant evidence of planning, and the fact that defendant stabbed Salazar Garcia twice in the chest does not show that his attempt to kill Salazar Garcia was "so particular and exacting that [he] must have [attempted to] intentionally kill[] according to a 'preconceived design' to take the victim's life in a particular way." (*Anderson, supra*, 70 Cal.2d at p. 27) Defendant further asserts that the surrounding circumstances show that he stabbed Salazar Garcia as the result of a hasty impulse in an "explosion of violence," and not as a result of a calculated plan.

In our view of the record, there was sufficient evidence from which a jury could infer that " 'the [attack] occurred as the result of preexisting reflection rather than unconsidered or rash impulse.' " (*People v. Steele* (2002) 27 Cal.4th 1230, 1249.) First, there was evidence of motive and planning. Defendant, a Norteño, intentionally went

12

into Sureño territory dressed all in black, at night, armed with a knife. The jury was entitled to disbelieve defendant's testimony that he was there by "accident," and instead believe the gang expert's testimony that Norteños sometimes enter Sureño territory to commit crimes in order to disrespect Sureños. The fact that defendant was in Sureño territory and was armed suggests that his attack on Salazar Garcia was premeditated. (*People v. Felix* (2009) 172 Cal.App.4th 1618, 1627 (*Felix*).)

In addition to the surrounding circumstances of the attack, defendant's own words directed at Salazar Garcia evince premeditation. Salazar Garcia testified that when defendant approached him, defendant said in Spanish, "Puro Norte Te voy a cargar chingada." The first part of the phrase means, "Pure North," references defendant's Norteño affiliation, and the latter part means, "I'm going to fuck you up." Salazar Garcia testified he understood defendant to mean, "he's going to kill me." The jury was entitled to give weight to defendant's verbal threats to Salazar Garcia made close to the attack as evidence of premeditation. (See, e.g., *Felix, supra,* 172 Cal.App.4th at p. 1626-1627.)

The manner of the attack here also supports a finding of premeditation. Salazar Garcia sustained two knife wounds to his chest, just below the collarbone, and one or both caused a collapsed lung. Defendant used great force to inflict the wounds, using one hand to brace himself against the car while he swung the knife with the other hand. Based on the circumstances, and the fact that Salazar Garcia did not provoke defendant, the jury could conclude that defendant attacked with premeditation and deliberation. (See, e.g., *People v. Lunafelix* (1985) 168 Cal.App.3d 97,102 [lack of provocation by the victim is a strong factor in concluding that an attack "was deliberately and reflectively conceived in advance"].)

Here, the totality of evidence, including defendant's gang affiliation, his statements at the time of the attack, the fact that he was armed, and the manner of the attack could lead a reasonable jury to conclude that defendant attempted to kill Salazar

13

with premeditation and deliberation. We find there was substantial evidence to support defendant's conviction for attempted premeditated murder.

### Gang Enhancement

A section 186.22, subdivision (b)(1) gang allegation has two elements. The crime must be "committed for the benefit of, at the direction of, or in association with any criminal street gang," and the defendant must harbor "the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(1).) Here, the prosecution's theory in support of the gang enhancement was that defendant attempted to murder Salazar Garcia for the benefit of the Norteños, and did so with the specific intent to assist, further, or promote criminal conduct by Norteños.

In support of the gang enhancement, the prosecution presented the evidence of their gang expert, Pisturino, who opined that defendant attempted to murder Salazar Garcia for the benefit of the Norteño gang. Pisturino based his opinion on a number of facts he considered important, including that defendant admitted to the jail classification personnel that he was a "Northerner," defendant had gang-related tattoos, Salazar Garcia was wearing a blue shirt and had on a Dallas Cowboys hat that defendant may have mistook for an affiliation with the Sureño gang, defendant committed the crime in Sureño territory and shouted out "Puro Norte," during the attack, which Pisturino stated was consistent with defendant broadcasting "that he was a gang member," and was giving credit to the Norteño gang for the crime.

Defendant argues that the gang expert's conclusion that defendant's attack on Salazar Garcia was gang related was speculative, and rested on nothing more than the commission of the crime by a gang member, which is insufficient evidence to support a gang enhancement as noted in both *People v. Ochoa* (2009) 179 Cal.App.4th 650, 662-663 (*Ochoa*), and *People v. Rios* (2013) 222 Cal.App.4th 542, 573-574 (*Rios*). We find both cases factually distinguishable from the present case. The defendant in *Ochoa* walked up to a person parked in a fast food restaurant's parking lot, pointed a shotgun at

14

him, demanded the car, and drove off. (*Ochoa, supra,* at p. 653.) The defendant in *Rios* was stopped in a stolen car, with an unregistered firearm beneath the driver's seat. (*Rios, supra*, at pp. 547-548.) In both cases, the circumstances of the crimes were either unknown or unaccompanied by any reference to the defendant's gang affiliation, and the theft of the cars was not followed by the car's use for gang purposes; in each case, the gang expert's opinion that the car thefts was gang related was accordingly too speculative to support a gang enhancement in the absence of further evidence tying the car theft to a gang. (*Ochoa, surpa,* at pp. 659-663; *Rios, supra,* at pp. 573-575.) This case is different. Although defendant was alone when he attacked Salazar Garcia, he made his victim aware of his gang affiliation by saying "Puro Norte" immediately preceding the attack. In addition, the fact that defendant committed his crime in Sureño territory and identified himself as Norteño at the time demonstrates he acted with the specific intent of furthering the Norteño gang. Unlike *Ochoa* and *Rios*, the link between the crime and gang activity in this case is not speculative.

In addition to *Ochoa* and *Rios*, defendant relies on *In re Frank S*. (2006) 141 Cal.App.4th 1192 (*Frank S*.) to support his claim that the gang expert's testimony was speculative. In *Frank S.*, the minor was stopped by police after he ran a red light on his bicycle. He gave a false name, and the officer found a concealed knife, a bindle of methamphetamine, and a red bandana in the minor's possession. (*Frank S., supra*, at p. 1195.) The minor admitted that he carried the knife to protect himself against " 'Southerners,' " as he was allied with northern street gangs. (*Ibid*.) A gang expert was permitted to testify that the minor's possession of the knife benefitted the gang because " 'it helps provide them protection should they be assaulted by rival gang members.' " (*Frank S., supra*, at p. 1199.) The court deemed this improper because, in its view, the expert opinion was not supported by any other evidence. "The prosecution did not present any evidence that the minor was in gang territory, had gang members with him, or had any reason to expect to use the knife in a gang-related offense." (*Ibid*.)

15

*Frank S.* is readily distinguishable. Here, defendant, a Norteño, entered Sureño territory armed with a knife. When he attacked Salazar Garcia, he said "Puro Norte," identifying his gang affiliation, and declaring to the Sureño neighborhood of his presence in "enemy territory." This evidence provided sufficient support for the gang expert's testimony that the attack was committed for the benefit of the Norteño gang.

We find substantial evidence to support the jury's finding that defendant attempted to kill Salazar Garcia for the benefit of the Norteño gang and with the specific intent to promote criminal conduct by the Norteños.

**Jury Instruction-Voluntary Intoxication**

Defendant asserts the trial court erred in failing to instruct the jury on voluntary intoxication as it relates to imperfect self defense.

The trial court did instruct with the CALCRIM No. 625 about voluntary intoxication as follows: "You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether the defendant acted with an intent to kill, or the defendant acted with deliberation and premeditation, or the defendant was unconscious when he acted. [¶] A person is voluntarily intoxicated if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect."

Defendant asserts this instruction was insufficient, because it specifically prohibited the jury from using evidence of voluntary intoxication for any purpose other than assessing whether defendant had the intent to kill or acted with premedication or deliberation. Defendant further argues that the theory of his case was that he was acting with the unreasonable belief in the need to use deadly force to defend himself, and that this unreasonable belief was as a result of voluntary intoxication.

We note defendant's argument of instructional error is waived for the purpose of this appeal. While defendant requested the instruction at trial, defense counsel did not

16

ask the court to modify CALCRIM No. 625 to inform the jury that voluntary intoxication could be considered when deciding if defendant had an actual, but unreasonable belief that harm was imminent in the context of his claim of imperfect self defense. CALCRIM No. 625 as stated to the jury in this case is a correct statement of the law. "A trial court has no sua sponte duty to revise or improve upon an accurate statement of law without a request from counsel [citation], and failure to request clarification of an otherwise correct instruction forfeits the claim of error for purposes of appeal. [Citations.]" (*People v. Lee* (2011) 51 Cal.4th 620, 638.)

However, even if we were to deem defendant's argument cognizable on appeal, we find any instructional error as to voluntary intoxication implicating his claim of imperfect self-defense harmless under both *People v. Watson* (1956) 46 Cal.2d 818, and the more stringent standard set forth in *Chapman v. California* (1967) 386 U.S. 18.

Based on the evidence at trial, if so instructed, the jury could not have concluded that defendant acted with imperfect self-defense because he was intoxicated. The only evidence that defendant was intoxicated came from defendant's own testimony at trial, and by all accounts, defendant was not a believable witness, having lied during testimony and during the investigation of the crime. Defendant did not provide a corroborating witness from the barbeque he attended immediately before the crime who could have testified about how much defendant drank that night or his drunken condition when he left. When interviewed by Detective Hedley following the attack and given the opportunity to tell his side of the story, defendant did not mention being intoxicated at the time of the crime. Moreover, defendant's acts following the crime of throwing away his bloody clothes and hiding with his fellow gang members demonstrates a consciousness of guilt that is inconsistent with an honest, but unreasonable belief that he needed to use force to defend himself from an imminent threat of harm. Finally, the verdict demonstrates that the jury did not believe that defendant's intoxication prevented him from premeditating and deliberating in forming the intent to kill Salazar Garcia.

17

Here, the scant evidence that defendant was intoxicated, coupled with the fact that the jury found that defendant acted with premeditation and deliberation in attempting to kill Salazar Garcia, and that he was not so drunk as to negate that intent, demonstrate that any instructional error regarding the impact of voluntary intoxication on a claim of imperfect self-defense was harmless beyond a reasonable doubt. (*Chapman v. California, supra,* 386 U.S. 18.)

**DISPOSITION**

The judgment is affirmed.

_____
                                    RUSHING, P.J.

WE CONCUR:


_____
        ELIA, J.




_____
        WALSH, J.[*]

_____

[*] Judge of the Santa Clara County Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

19