[No. B204858. Second Dist., Div. Eight. Apr. 16, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
ANDRES FELIX, Defendant and Appellant.

COUNSEL

Ava R. Stralla, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Paul M. Roadarmel, Jr., and Viet H. Nguyen, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**O'NEILL, J.**\*—After threatening to kill Martin Gomez, appellant Andres Felix fired two gunshots into Mr. Gomez's master bedroom window. Felix knew Mr. Gomez was at home, and knew it was highly likely that two children were also in the house. A jury convicted Felix of attempted premeditated murder, with a finding that he personally discharged a firearm

---

\*Judge of the Ventura Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

during the commission of the offense; shooting at an inhabited dwelling; and three counts of assault with a firearm with a finding attached to each count that he personally used a firearm. We hold that, under the circumstances, the evidence supports the jury's conclusion that Felix had the necessary mental states for the crimes of attempted premeditated murder of Mr. Gomez, and assault with a firearm on the children.

The trial court sentenced Felix to a term of life with the possibility of parole on his attempted murder conviction, plus 20 years for the firearm enhancement. The abstract of judgment indicates that the trial court imposed concurrent determinate terms on Felix's four other convictions. We affirm the judgment, but remand the cause to the trial court with directions to issue a corrected abstract of judgment which shows that sentence on one of those four counts is stayed.

## FACTUAL AND PROCEDURAL HISTORY

### I. The Crimes

For two years leading up to February 2005, Felix lived with Isvett Ortiz, with whom he had fathered a child. During the evening of February 8, 2005, Isvett was at the home of Felix's cousin when Felix arrived. Felix had been drinking; he cussed at Isvett and threatened to kill her if she did not come home. When she declined he hit her on the head twice with a handgun. Felix then took Isvett back to their home, where Felix called Isvett's "auntie" because Isvett was bleeding from a cut on her head. About 11:00 p.m., Isvett's mother, Francisca Gomez, arrived at the cohabitants' home to take Isvett to the hospital. Felix was holding and playing with a handgun. He yelled, "You want me to kill your daughter?"

After Francisca and Isvett left, Felix called Isvett's and Francisca's cell phones repeatedly. During a conversation with Francisca, Felix again threatened to kill Isvett. Later, he said he believed Francisca and Isvett were going to the police station, not the hospital, and stated, "You are going to be sorry. I am going to kill your husband [Martin Gomez]." Francisca called Martin and told him about the threat. She urged him to call the police. Both women turned their cell phones off. Isvett and Francisca did go to the hospital, where Isvett received seven stitches for a cut on the side of her head.

Felix also made "a lot" of phone calls to Martin, Isvett's stepfather and Francisca's husband, at the Gomez residence. He repeatedly asked if Martin knew where Francisca and Isvett were. Each time Martin said he did not know, Felix became angrier. Eventually, Felix told Martin, "Don't you think I dare to kill you." Although Martin did not believe Felix meant it, he told his

brother Jose, who gathered Jose's girlfriend and her child, along with Martin's children (14-year-old Lisette Gomez, and 10-year-old Juan Gomez) in a single bedroom. Martin retired to the master bedroom, and turned a television on. Outside the master bedroom is an alley which runs east-west along the north side of the house. Two master bedroom windows, which we shall refer to as the "west window" and the "east window," face the alley. The windows are about 10 feet apart. A dresser with a large upright mirror resting on it blocks access to the east window from inside the room.

Shortly after midnight (early on Feb. 9, 2005), while Isvett and Francisca were still at the hospital, Felix drove to the Gomez family home. Felix was familiar with the home from many visits before Isvett moved out. He knew Martin and the two Gomez children lived there, but would not necessarily have known Jose and the others were visiting.

Martin heard Felix's car drive up in the alley outside the master bedroom. He heard tires screeching and Felix's favorite music playing very loud. When Martin looked out the west window, he saw Felix in the alley on the far side of the car. Felix pointed a .38-caliber handgun at the east window. Martin dropped to the floor and, immediately thereafter, heard two gunshots and things breaking in the room. He heard Felix drive away.

Both bullets penetrated a heavy metal screen and the east master bedroom window, then went through the mirror located immediately inside the window. One round traveled through the bedroom and lodged in the wall of an adjacent hallway. The other, after passing through the master bedroom door and the hallway, glanced off a bathroom doorframe, passed through the bathroom, penetrated a miniblind covering an open bathroom window, and fell to the ground outside the house. That bathroom was shared by the entire family.

## II. The Prosecution

In August 2007, the People filed an information charging Felix with the attempted premeditated murder of Martin Gomez (count 1), shooting at an inhabited dwelling (count 2), and assault with a firearm on Martin Gomez, Lisette Gomez, and Juan Gomez (counts 3, 4 & 5). During a three-day jury trial in December 2007, the prosecution presented evidence establishing the facts summarized above. On December 18, 2007, the jury returned verdicts finding Felix guilty as charged. The trial court orally pronounced sentence "forthwith" as follows: count 1: life with the possibility of parole plus 20

years for the firearm enhancement; count 2: five year midterm to run concurrently with count 1; count 3: three year midterm plus four years for the firearm enhancement, stayed pursuant to Penal Code section 654; count 4: three year midterm plus four years for the firearm enhancement, to run concurrently with count 1; and count 5: three year midterm plus four years for the firearm enhancement, to run concurrently with counts 1, 2, and 4.[1]

## DISCUSSION

### I. Sufficiency of evidence of premeditated attempted murder

Implicitly acknowledging that he was the shooter, Felix contends the evidence was not sufficient to support his conviction for the attempted premeditated murder of Martin Gomez because the evidence did not show that he possessed the specific intent to kill, or that he premeditated. We disagree.

When a criminal defendant challenges the sufficiency of the evidence in support of a conviction, the reviewing court's task is to determine whether, in light of the whole record viewed in the light most favorable to the prosecution, a rational trier of fact could have found the elements of the crime beyond a reasonable doubt. (*People v. Earp* (1999) 20 Cal.4th 826, 887–888 [85 Cal.Rptr.2d 857, 978 P.2d 15]; *People v. Ramos* (2004) 121 Cal.App.4th 1194, 1207 [18 Cal.Rptr.3d 167] (*Ramos*).) The standard of review on appeal is the same when the prosecution has relied on circumstantial evidence. (*People v. Sanchez* (1995) 12 Cal.4th 1, 32 [47 Cal.Rptr.2d 843, 906 P.2d 1129].) Consequently, we cannot accept Felix's invitation to reweigh such evidence as his emotional state and alleged intoxication, his reckless driving and past relationship with Martin Gomez. We reject his claim that the necessary mental states were absent as a matter of law.

### A. *Intent to kill*

■ "Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." (*People v. Superior Court (Decker)* (2007) 41 Cal.4th 1, 7 [58 Cal.Rptr.3d 421, 157 P.3d 1017].) A defendant's intent is rarely susceptible of direct proof, and may be inferred from the facts and circumstances surrounding the offense. (*Ramos, supra,* 121 Cal.App.4th at pp. 1207–1208.) In *Ramos,* for example,

---

[1] The minute order and abstract of judgment do not exactly conform to the trial court's oral pronouncement of sentence. As we explain below, the clerk of the superior court is to correct the abstract.

several gang members came to a party armed in case of trouble. An altercation did occur, between one of the gangsters and another partygoer, who fled with three friends in a vehicle. The gang members opened fire on the vehicle, resulting in four attempted murder convictions, which were upheld on appeal. (*Id.* at p. 1208.)

In *People v. Vang* (2001) 87 Cal.App.4th 554, 564 [104 Cal.Rptr.2d 704], attempted murder verdicts were upheld as to both targeted and untargeted occupants, where rival gang members fired volleys of high-powered, wall-piercing firearms at inhabited dwellings in retaliation for earlier violence. The court in *Vang* even upheld a count of attempted murder as to an intended victim who *was not even present* when the shooting occurred. (*Ibid.*)

A direct threat to kill, followed by unequivocal actions, provides a particularly strong set of circumstances, as illustrated by *People v. Morales* (1992) 5 Cal.App.4th 917 [7 Cal.Rptr.2d 358], where a jury convicted the defendant of the attempted murder of his estranged wife's boyfriend, John, rejecting a defense claim the defendant had acted in the midst of an alcoholic blackout. In upholding the verdict, the Court of Appeal relied on the following facts, which bear significant similarities to the present case: "At approximately 5 p.m., defendant called his home and told Clara he was going to get her boyfriend. A short time later, defendant came home, went to his bedroom and loaded his gun. As he left the house, defendant pointed the gun at Clara, and again announced he was going to get John, then come back for her. Defendant apparently drove directly to [John's neighborhood], parked his car and went to John['s] house. He was discovered crouched near a garbage pail, three or four feet from the exit of [John's] house." (*Id.* at p. 926.) As to the alcohol defense, the court commented: "Even if the defense theory that defendant was operating in an alcoholic blackout was true, the jury was free to believe Dr. Edwards's testimony that defendant still could appreciate what was happening." (*Ibid.*; see also *People v. Martinez* (1987) 193 Cal.App.3d 364, 371 [238 Cal.Rptr. 265] [repeated threats to kill victim if defendant caught her with another man constituted evidence of planning that supported premeditated murder verdict despite defense claim of intoxicated rage]; *People v. Evans* (1970) 8 Cal.App.3d 152, 157 [87 Cal.Rptr. 315] [premeditation finding supported by evidence that, at the conclusion of a divorce proceeding, defendant had mouthed the words, " 'I'm going to get you,' " to his estranged wife's parents, whom he killed later the same day].)

■ In the present case, the reasonableness of the jury's finding that intent to kill was present is beyond dispute. After twice threatening to kill Martin Gomez within a period of about an hour, Felix armed himself with a firearm of a substantial caliber, drove to Martin's house and parked outside what he knew to be the master bedroom. From close range and with the glow from the

television visible, Felix fired two gunshots into a master bedroom window. After fleeing, he called and asked if he had harmed anyone. Although other conclusions could have been reached, the jury's verdict was supported by substantial evidence that Felix specifically intended to kill Martin when he fired the shots into Martin's bedroom. (See *People v. Perez* (1992) 2 Cal.4th 1117, 1124 [9 Cal.Rptr.2d 577, 831 P.2d 1159] [on appeal, existence of other reasonable interpretations of the evidence does not warrant reversal].)

## B. *Premeditation and deliberation*

■ " '[P]remeditated' means 'considered beforehand,' and 'deliberate' means 'formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.' " (*People v. Mayfield* (1997) 14 Cal.4th 668, 767 [60 Cal.Rptr.2d 1, 928 P.2d 485].) "The process of premeditation and deliberation does not require any extended period of time. 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . .' " (*Ibid.*) The fundamental inquiry is whether a rational jury could have concluded that the crime occurred as a result of preexisting reflection rather than a rash or unconsidered impulse. (*People v. Sanchez, supra*, 12 Cal.4th at p. 33.)

In examining whether the evidence is sufficient to show that a defendant premeditated, a reviewing court may consider a tripartite framework— (1) planning activity, (2) motive, and (3) manner of the killing or attempt—in determining whether such intent may be inferred from the trial record. (See *People v. Anderson* (1968) 70 Cal.2d 15, 26–27 [73 Cal.Rptr. 550, 447 P.2d 942].) This framework does not establish an exhaustive list of required evidence that excludes all other types and combinations of evidence that may support a jury's finding of premeditation (*People v. Perez, supra*, 2 Cal.4th at p. 1125), nor does it require that all three elements must be present to affirm a jury's conclusion that premeditated murder was intended. (*People v. Raley* (1992) 2 Cal.4th 870, 887 [8 Cal.Rptr.2d 678, 830 P.2d 712]; see *People v. Mayfield, supra*, 14 Cal.4th at p. 768 [*Anderson* factors are not well adapted to a case where postoffense statements provide insight into offender's state of mind at time of offense].)

The present case involves preoffense words from the perpetrator's own mouth which shed light on the issue of premeditation. Over the course of about an hour prior to the shooting, Felix twice threatened to kill Martin and

also threatened Isvett's life at least twice. The jury was entitled to give significant weight to Felix's verbal expressions of malice made so close in time to the shooting. Further evidence showed motive, namely Felix's anger at the possibility that his wounding of Isvett might be reported to the police, and his frustration that she was out of his control and Martin was not forthcoming with information about her whereabouts.

The jury could also infer planning, in that Felix armed himself with a .38-caliber firearm and drove to Martin's house, knowing he was home. The manner of the shooting was no doubt important to the jury as well, in that Felix fired twice into what he knew to be the master bedroom, from close range and with the glow from the television strongly suggesting Martin was in the room.

After fleeing, Felix's own words again became relevant, in that he called and asked if he had wounded or killed anyone.

We are satisfied that this evidence adequately supports the jury's conclusion that Felix premeditated the intent to kill Martin Gomez, even though he did not succeed in carrying out his intent.

Further, even had Felix not made direct threats to kill Martin, case law would support the reasonableness of inferring premeditation (as well as intent to kill) from the fact that Felix fired two shots into Martin's apparently occupied bedroom, after arming himself in response to his anger over the earlier events. As noted above, in *Ramos, supra,* 121 Cal.App.4th at page 1208, a count of premeditated attempted murder was upheld as to each victim in a fleeing vehicle based on evidence the gangster perpetrators, who came to a party armed and expecting trouble, fired indiscriminately at the vehicle. (See also *People v. Bland* (2002) 28 Cal.4th 313, 330 [121 Cal.Rptr.2d 546, 48 P.3d 1107] [California Supreme Court adopts terminology "kill zone" in explaining why a jury could reasonably reach premeditated attempted murder convictions as to all occupants of a car into which the defendant fired several bullets, even though only one victim was the primary target].)

## II. Sufficiency of evidence of assault with a firearm

Felix contends the evidence was insufficient to support his convictions for assault with a firearm on Lisette Gomez and Juan Gomez (counts 4 and 5) because he fired the gunshots into their home without absolute certainty they were present. We disagree, for reasons that require a dip in the murky waters of California's law of assault.

██ Unlike other jurisdictions, in California assaults require no subjective specific intent to injure or even batter another person. As the California Supreme court has stated: "Considered from this perspective, it is clear that the question of intent for assault is determined by the character of the defendant's willful conduct considered in conjunction with its direct and probable consequences. If one commits an act that by its nature will likely result in physical force on another, the particular intention of committing a battery is thereby subsumed. Since the law seeks to prevent such harm irrespective of any actual purpose to cause it, a general criminal intent or willingness to commit the act satisfies the mens rea requirement for assault." (*People v. Colantuono* (1994) 7 Cal.4th 206, 217 [26 Cal.Rptr.2d 908, 865 P.2d 704].) More recently, the court has stated: "Logically, a defendant cannot have such an intent unless he actually knows those facts sufficient to establish that his act by its nature will probably and directly result in physical force being applied to another, i.e., a battery. (Cf. [Pen. Code,] § 7, subd. 5 [actual knowledge means 'a knowledge that the facts exist which bring the act or omission within the provisions of this code'].) In other words, a defendant guilty of assault must be aware of the facts that would lead a reasonable person to realize that a battery would directly, naturally and probably result from his conduct. He may not be convicted based on facts he did not know but should have known. He, however, need not be subjectively aware of the risk that a battery might occur." (*People v. Williams* (2001) 26 Cal.4th 779, 787–788 [111 Cal.Rptr.2d 114, 29 P.3d 197].) ██ In *Williams*, the court also stated that, "a defendant who honestly believes that his act was not likely to result in a battery is still guilty of assault if a reasonable person, viewing the facts known to defendant, would find that the act would directly, naturally and probably result in a battery." (*Id.* at p. 788, fn. 3.)

It follows from this objective standard that "[A]n intent to do an act which will injure any reasonably foreseeable person is a sufficient intent for an assault charge." (*People v. Tran* (1996) 47 Cal.App.4th 253, 262 [54 Cal.Rptr.2d 650].) *Tran* held chasing a man while brandishing an 18-inch knife constituted an assault on both the intended victim and a sleeping baby being carried by that victim, even though there was no intent to harm the child. (*Ibid.*) In *People v. Spence* (1970) 3 Cal.App.3d 599, 604 [83 Cal.Rptr. 711] (disapproved on another ground in *People v. Rocha* (1971) 3 Cal.3d 893, 899, fn. 8 [92 Cal.Rptr. 172, 479 P.2d 372]), a jury inference that firing two bullets into a car containing three people constituted three assaults was upheld on appeal. In *People v. Lee* (1994) 28 Cal.App.4th 1724, 1734 [34 Cal.Rptr.2d 723], a jury finding that firing three shots at an intended victim constituted both attempted murder of that victim and assault on a nearby companion of that victim was upheld.

In *People v. Riva* (2003) 112 Cal.App.4th 981, 986 [5 Cal.Rptr.3d 649], the defendant admittedly fired a gun multiple times from his car at the occupants of another car at an intersection in Long Beach. He missed his intended targets, but a bullet struck and wounded a woman as she walked with her grandchildren and a friend on an adjacent sidewalk. In addition to being charged with shooting at the vehicle, the defendant was charged with assault with a deadly weapon against the unintended victim. The Court of Appeal found harmless error based on the failure to instruct the jury concerning the same "actual knowledge" requirement at issue in the present case.[2] In the course of its analysis, the Court of Appeal found that a properly instructed jury could and would have convicted Riva of assault of the wounded pedestrian. The court noted the shooting occurred at approximately 5:00 p.m. in a mixed residential and shopping area, and that Riva would have known that numerous pedestrians and cars were in the area. The court concluded that such facts "would lead a reasonable person to realize if he fired a gun at someone in a car at this time of day in this kind of neighborhood the bullet could strike [at least one] pedestrian and a battery would directly, naturally and probably result from his conduct." (112 Cal.App.4th at p. 998.) The court added that, "even under the 'actual knowledge' test when the defendant shoots into a crowd the People do not have to prove he was aiming at a particular target." (*Ibid.*)

Felix would distinguish these cases as involving secondary victims whose presence was readily apparent to the perpetrator. He relies on *People v. Birch* (1969) 3 Cal.App.3d 167, 172–173 [83 Cal.Rptr. 98], where the defendant fired a shot from inside her apartment, through a window at an intended victim named Ferguson. The defendant was apparently unaware that a police officer named Council was just outside the window, inches away from the trajectory of the bullet. The Court of Appeal reversed the assault against Council, because "there is no evidence in the record that the bullet fired at Ferguson was intended to inflict a violent injury upon Officer Council." (*Id.* at p. 177.) In reaching this conclusion, the *Birch* opinion defined assault as requiring "that the defendant intended to commit a violent injury" on another. (*Ibid.*) The problem with relying on *Birch* is that it predates the California Supreme Court's repeated attempts to clarify the mens rea of assault, culminating in *People v. Williams*. As already explained, no subjective intent to injure a particular victim is required. Rather, a defendant's intended acts are evaluated objectively to determine whether harm to a charged victim was foreseeable. (*People v. Wright* (2002) 100 Cal.App.4th 703, 706 [123 Cal.Rptr.2d 494].)

---

[2] Here, the jury was properly instructed with the current version of CALCRIM No. 860, defining assault with a firearm.

Applying that test to the present facts, the evidence shows that Felix had been dating Isvett for six years, and that he was considered, in Isvett's words, "part of the family." Felix had been in the Gomez family home on many occasions before he and Isvett began living together. Felix knew that victims Lisette and Juan lived in the house with their father, Martin Gomez, and that they were school-age children. The shooting occurred a few minutes after midnight on a February weeknight. Tellingly, Felix called Martin Gomez after the shooting, and asked "if anyone had been wounded or if anybody was dead, something like that."

These facts are closely analogous to the cases we summarized above involving shooting into crowds or at small groups of people. While not every shooting into a car or building will satisfy the "actual knowledge" requirement of *Williams*, here Felix had detailed, intimate knowledge of the house and inhabitants. He *actually knew* he was endangering the lives of three or more members of the family when he fired into the house. Indeed, he knew their names and ages, and he inquired about their well-being after the shooting. The evidence is sufficient to support the jury's implied finding that Felix knew it was highly likely that Lisette and Juan were in the house at the time he fired the gunshots. He thus knew that his acts would "probably and directly result in physical force" against them. (See *People v. Williams, supra*, 26 Cal.4th at p. 790.)

### III. Failure to stay sentence for shooting at inhabited dwelling

The trial court imposed concurrent sentences on count 1 (attempted murder) and count 2 (shooting at an inhabited dwelling). Felix contends his conviction on count 1 and his conviction on count 2 are based on the same act, committed during a single indivisible course of conduct, and this means that his sentence on his count 2 conviction for shooting at an inhabited dwelling should have been stayed pursuant to Penal Code section 654, not run concurrent to his count 1 conviction for attempted murder. The People respond that, even if Felix shot at an inhabited dwelling (count 2) for the primary purpose of murdering Martin Gomez (count 1), the former offense "nevertheless involved a separate act of violence . . . against other victims" because there were other people in the house, namely, Martin Gomez's relatives who were staying at the house while they were on vacation.

The People are correct. There is a multiple victim exception to Penal Code section 654 which allows separate punishment for each crime of

violence against a different victim, even though all crimes are part of an indivisible course of conduct with a single principal objective. (*People v. McFarland* (1989) 47 Cal.3d 798, 803 [254 Cal.Rptr. 331, 765 P.2d 493].) An assailant's greater culpability for intending or risking harm to more than one person precludes application of section 654. (47 Cal.3d at p. 803.)

■ As illustrated by *People v. Anderson* (1990) 221 Cal.App.3d 331 [270 Cal.Rptr. 516], where the crime of shooting at an inhabited residence is involved, a defendant need not be aware of the identity or number of people in the house to be punished separately for each victim. In that case, four defendants carried out an armed invasion of a home, expecting to find the owner in possession of drugs and money. As it happened, the owner's sister was house-sitting, and had invited three of her friends over for the evening. After firing into the residence while posing as federal agents, the perpetrators entered and committed additional violent crimes against three of the four occupants. (*Id.* at p. 335.) On appeal, one of the defendants argued that her consecutive sentences for both robbery and shooting at the dwelling violated Penal Code section 654. Another division of this court upheld the sentences pursuant to the multiple victim exception, which the court indicated is applicable as long as each violent offense involves at least one different victim. Since only three of the four victims of the shooting at the dwelling offense in *Anderson* had been the charged victims in other counts, the existence of the fourth victim supported application of the multiple victim exception to the charge of shooting at the inhabited dwelling. (221 Cal.App.3d at pp. 338–339.)

The present case is indistinguishable. Like the fourth occupant in *People v. Anderson, supra,* 221 Cal.App.3d 331, Martin Gomez's houseguests were victimized by the shooting into the dwelling but were not named victims in any other count. It follows that the trial court properly declined to stay the sentence on count 2 (shooting at an inhabited dwelling) because it is governed by the multiple victim exception to Penal Code section 654.

### IV. Discrepancy between pronouncement of sentence and abstract

Felix contends, the People concede, and we agree that the abstract of judgment must be corrected to reflect the trial court's oral pronouncement at sentencing that his sentence on count 3—the assault with a firearm on Martin Gomez—is stayed pursuant to Penal Code section 654.

## DISPOSITION

The cause is remanded to the trial court. The clerk of the superior court is directed to prepare and forward to the parties and the Department of Corrections and Rehabilitation an amended abstract of judgment showing that Felix's sentence on count 3 (assault with a firearm on Martin Gomez) is stayed pursuant to Penal Code section 654. In all other respects, the judgment is affirmed.

Rubin, Acting P. J., and Bigelow, J., concurred.

Appellant's petition for review by the Supreme Court was denied July 8, 2009, S173003.