Filed 9/30/15  P. v. Truss CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>CRAIG EDWARD TRUSS,<br><br>    Defendant and Appellant. | B257842<br><br>(Los Angeles County<br>Super. Ct. No. MA061427) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Lisa M. Chung, Judge.  Affirmed.

Roberta Simon, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Margaret E. Maxwell and Thomas C. Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Craig Edward Truss (defendant) appeals from the judgment entered after he was convicted of attempted murder, assault, and illegal possession of a firearm. He challenges his conviction of two counts of assault with a semiautomatic firearm, claiming that the evidence was insufficient to prove the mental state required for assault. Finding no merit to defendant's contention, we affirm the judgment.

## BACKGROUND

### Procedural history

Defendant was charged by amended information with the following five felonies: count 1, the attempted willful, deliberate, and premeditated murder of Willie Johnson (Johnson), in violation of Penal Code sections 664 and 187, subdivision (a);[1] counts 2, 3, and 4, assault with a semiautomatic firearm upon Ronald Pigee, America Collins, and Ronee Collins, respectively, in violation of section 245, subdivision (b); and count 5, possession of a firearm by a felon, in violation of section 29800, subdivision (a)(1). As to count 1, it was alleged that defendant personally and intentionally used and discharged a firearm causing great bodily injury, within the meaning of section 12022.53, subdivisions (b), (c), and (d), and that he caused Johnson great bodily injury, within the meaning of section 12022.7, subdivision (a).[2] As to counts 2, 3, and 4, the amended information further alleged that defendant personally used a semiautomatic firearm within the meaning of section 12022.5, subdivision (a).

A jury found defendant guilty of counts 1, 2, 3, and 5, as charged, and not guilty of count 4. The jury found true the all firearm enhancement allegations except the allegation under section 12022.53, subdivision (d), which it found not true. On July 25, 2014, the trial court sentenced defendant on count 1 to life in prison with a minimum parole period of seven years, plus a consecutive 20-year term for the personal and

---

[1] All further statutory references are to the Penal Code, unless otherwise indicated.

[2] The amended information was further amended orally in open court. There was no finding as to the allegation of great bodily injury under section 12022.7, subdivision (a), as it did not appear on the verdict form.

2

intentional discharge of a firearm as alleged under section 12022.53, subdivision (c). Punishment on the other firearm allegations was stayed. To each of counts 2 and 3, the court imposed a concurrent term of 19 years, consisting of the high term of nine years, enhanced by 10 years for the use of a firearm. The court imposed the high term of three years as to count 5, also to run concurrently. Defendant was ordered to pay mandatory fines and fees, and was given 292 days of presentence custody credit, consisting of 254 actual days and 38 days of conduct credit.

Defendant filed a timely notice of appeal from the judgment.

**Prosecution evidence**

During the evening of November 23, 2013, there was a family gathering at the home of Ricky Pigee, where he lived with his daughter America Collins, her boyfriend Willie Johnson (Johnson), and their infant son.[3] In addition to America and Johnson, those attending the gathering were Ronee, Ronald, his girlfriend Anisha Truss (defendant's sister), family friend Sandy Francini, and her boyfriend, Keion Green. Ricky remained in the house while the others were in the garage, which was furnished with couches and another television set.

At approximately 10:00 p.m., defendant arrived with his brother Deshane (Deshane).[4] When they went into the garage, defendant smelled of alcohol and acted like a bully. He asked for alcohol and was given a drink, which he finished and then asked for more. When Johnson refused defendant another drink, defendant took Ronald's drink from him, drank it, and threw the cup back to Ronald. Johnson became upset with defendant and told him to leave. Defendant refused, and the two men began pushing and then swinging at each other. Ronald, Keion, and Deshane managed to pull them apart,

---

**3** Ricky Pigee is the father of Ronald Pigee and America Collins, and their mother is Ronee Collins. As these and other people mentioned at trial share surnames, we will use the first names in order to avoid confusion. We refer to all those who do not share a surname by their last names.

**4** Deshane's last name was not mentioned at trial. The witnesses referred to him as "Da-Da."

and defendant went outside where he remained for five to ten minutes calling Johnson to come out and fight. Someone called defendant's father Clarence Truss, who came, calmed defendant, and followed when defendant left with Deshane.

About 15 minutes later, defendant returned, tried to break down the side door of the garage, and yelled at Johnson to come outside. Johnson became angry and went outside to confront defendant, followed by America and Ronald, and then all the others who had been in the garage. Ronald was in front of Johnson, with Ronee and America on either side of Johnson. Shani Green, defendant's girlfriend was with their children in her car, which was parked in the middle of the street. Ronald accused defendant of being drunk, said his kids were in the car, and that he should go home. Defendant then pulled out a gun and said to Johnson something to the effect that he hoped someone could take care of his baby or son. Defendant then fired the gun at Johnson, wounding him in the head.[5] America heard one more gunshot, and then Ronald grabbed defendant's arm while Johnson hopped on top of defendant.

In their trial testimony, Johnson, America, and Ronee described their positions in relation to Johnson and one another at the time defendant fired his weapon. Johnson testified that he was three to five feet away from defendant; Ronald was standing in front of Johnson with about two or three steps between them, and Ronald's shoulder aligned with the middle of Johnson's chest; America was standing behind Johnson. Ronee testified that when defendant fired, she was close to Johnson, and it seemed to her that the bullet went between them; Ronald was in front, face to face with defendant, she was next to Johnson, and America was on the opposite side of Johnson. America testified that she told police afterward that she was standing approximately four feet west of defendant, with Johnson behind her. She attempted to clarify their positions by explaining, "He [Johnson] was standing on the side of me, but I was more -- I was a little bit, like, a foot back from him."

---

**5**      By the time of trial, Johnson had fully recovered, other than a scar which left a small bald spot on his scalp.

After defendant fired, Johnson and Ronald rushed him. Johnson choked defendant and beat him with bottles which were handed to him by Francini. As Johnson hit him, defendant fired the gun two or three more times; one of those bullets hit Ronee's car, which was parked nearby.[6]

During the struggle, Green drove away with America to find defendant's father Clarence, who lived nearby. Deshane returned in Green's car, with Greene's children inside, but without Green or America. Ronee went to the car, insisted that Deshane drive her back to Clarence's house, returned the children, and drove back to the Pigee house. As she walked back to the house, America heard the additional gunfire.

Defendant went to his father's house, which was soon surrounded by the police. After two hours of repeated demands to come out, defendant came out with Green and was taken to the hospital with multiple lacerations.

**Defense evidence**

Green testified that at the time of the shooting defendant was her fiancé and they lived together with their two children. Defendant arrived home that night a little after 10:00 p.m. and told her that someone had tried to fight him. Since he had left his wallet at his father's house, she agreed to drive him there to retrieve it. At approximately 11:00 p.m., they put their children in the car, and Green drove her normal route toward defendant's father's home. She stopped the car when someone waved them down from the driveway of a house. Defendant got out, walked up the driveway, and after exchanging words with some men, they rushed him and "packed" him. Green saw five men, but no women, and did not hear a gunshot. Green left the scene without defendant. She explained that she did not call 911 because she had her children in the car and she assumed that Deshane was there and would help defendant. About 20 minutes after defendant arrived at his father's house, he became incoherent, so Green called for an

---

[6] The gun was never found. Two .45-caliber expended bullets and one cartridge case were found at the scene. Markings indicated they were fired from either a semi-automatic or automatic firearm.

ambulance.**7** She denied that defendant had a gun, or that she saw anyone with a gun. The police arrived before the ambulance. Green explained that they would have come out during the time the police were surrounding the house if the ambulance had been there.

Defendant called Los Angeles Deputy Sheriff Donald Chavez who conducted interviews at the scene shortly after the shooting. Deputy Chavez and his partner were first to arrive, and he described the scene as one of chaos and panic. Ronee reported that defendant took a gun from a jacket pocket and fired two times. America also said that a gun was pulled from a jacket pocket. America said that Johnson was behind her and she was four feet away when the assailant pulled the gun from his jacket and fired twice. America said that later, when bottles are being broken over defendant's head, he fired another shot toward the house.

## DISCUSSION

Defendant's sole contention on appeal is that his conviction of counts 2 and 3, assault with a semiautomatic firearm upon Ronald and America, was unsupported by substantial evidence. In particular, defendant contends that the evidence was insufficient to establish the actus reus or the mens rea. Defendant uses the two concepts interchangeably. Defendant does not appear to challenge the sufficiency of the evidence that he fired a semiautomatic firearm, instead he argues that the evidence supported a finding that he "did not *have* an actus reus calculated to injure others in the group." (Italics added.) We assume that defendant's contention is that he did not act with the requisite mental state.

"The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.]"

---

**7**     According to the transcript of the 911 call, Green made the call at 1:26 a.m., November 24, 2013, and she gave her name as Stacy.

6

(*People v. Jones* (1990) 51 Cal.3d 294, 314.) "The same standard applies when the conviction rests primarily on circumstantial evidence. [Citation.]" (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) "An appellate court must accept logical inferences that the jury might have drawn from the circumstantial evidence. [Citation.]" (*People v. Maury* (2003) 30 Cal.4th 342, 396.)

Assault requires a mental state of general criminal intent. (*People v. Colantuono* (1994) 7 Cal.4th 206, 214-215.) "[A]ssault does not require a specific intent to cause injury or a subjective awareness of the risk that an injury might occur. Rather, assault only requires an intentional act and actual knowledge of those facts sufficient to establish that the act by its nature will probably and directly result in the application of physical force against another." (*People v. Williams* (2001) 26 Cal.4th 779, 790.) It is an objective standard: "For example, a defendant who honestly believes that his act was not likely to result in a battery is still guilty of assault if a reasonable person, viewing the facts known to defendant, would find that the act would directly, naturally and probably result in a battery." (*Id.* at p. 788, fn. 3.)

Although we do not agree that the evidence showed that defendant fired only a single shot, a single shot under the circumstances of this case would be sufficient to support defendant's convictions. Defendant does not challenge the evidence establishing that he fired toward Johnson with the intent to kill him. Johnson was three to five feet away from defendant at the time, Ronald was between them, Ronee was so close to Johnson that she was aware of the bullet passing by, and America was within four feet of defendant and Johnson. We agree with respondent that multiple convictions for assault with a firearm may be supported by evidence of a single gunshot fired by the defendant toward a group of people in close proximity to one another. (*People v. Perez* (2010) 50 Cal.4th 222, 224, 233-234 (*Perez*).)

Defendant contends that *Perez* supports his contention that he "did not have an actus reus calculated to injure others in the group." Assuming that defendant means that he did not intend to injure others in the group, *Perez* in fact demonstrates that such an intent was not required here. In *Perez*, the California Supreme Court reversed seven

7

counts of attempted murder and affirmed one count of attempted murder, upon finding the evidence that the defendant had fired a single bullet at a group of eight persons from a distance of 60 feet was sufficient to establish that he acted with intent to kill someone in the group, but not sufficient to support a finding that he intended to kill more than one of them. (*Perez*, *supra*, 50 Cal.4th at p. 230.) The court explained that attempted murder required the specific intent to kill, and the single shot from 60 feet away did not give rise to a reasonable inference that the defendant intended to kill more than one person; however, because a single shot in the direction of a group did establish that defendant's willful act endangered the lives of each individual in the group, he was guilty of seven counts of assault with a firearm. (*Id*. at pp. 233-234.) To be sure, assault requires something more than just criminal negligence or even mere recklessness, as a defendant cannot be guilty of assault based on facts he should have known but did not know; however, this does not mean that the defendant must have a specific intent to injure the victim. (*People v. Williams*, *supra*, 26 Cal.4th at p. 788.) He need only intend to commit an act while aware of circumstances that would lead a reasonable person to foresee that his act would injure someone. (See *People v. Felix* (2009) 172 Cal.App.4th 1618, 1628.)

Defendant contends that it was not reasonably foreseeable that Ronald and America would be injured by his act, because he targeted Johnson and never pointed the gun directly at Ronald, who was between them and a foot away, or at America, who was four feet away. If defendant had targeted Ronald and America as well as Johnson, and had pointed the gun directly at them, the three would have been in alignment, and his single gunshot would then have given rise to the reasonable inference that he intended to kill all three of them. (See, e.g., *People v. Smith* (2005) 37 Cal.4th 733, 743.) As specific intent to injure or kill was unnecessary here, evidence of pointing the gun at Ronald and America was equally unnecessary. Nor did the distance of the victims to one another negate the reasonable foreseeability of injuring them. In *Perez*, firing a single bullet toward persons standing two, three, four, five, and eight feet apart was sufficient to support a finding that injury to all of them was reasonably foreseeable. (See *Perez*,

8

*supra*, 50 Cal.4th at p. 227.) Ronald and America being one and four feet away was certainly sufficient.

Finally, defendant appears to argue that any reasonable person who specifically targets one person in a group would not foresee injury to those not specifically targeted. He suggests that this contention is supported by the *absence* of published authority holding that targeting a single person in a group, aiming only at that person, and firing a single shot would lead a reasonable person to realize that those nearby could be injured. To find merit in defendant's argument, we would have to presume that the objective standard is based upon the ordinary reasonable sharpshooter who would never miss a shot. The absence of authority on such a point is unsurprising, and we decline to create such a presumption. We conclude that a reasonable person would foresee that firing a weapon under the circumstances established by substantial evidence in this case would by its nature probably and directly result in the application of physical force against Ronald and America.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

_____, J.
CHAVEZ

We concur:


_____, Acting P. J.
ASHMANN-GERST


_____, J.
HOFFSTADT