Filed 3/16/26  P. v. Grana CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> LUIS A. CHAVEZ GRANA, <br><br> Defendant and Appellant. | F088682 <br><br> (Super. Ct. No. F23908538) <br><br> **OPINION** |

### THE COURT[*]

APPEAL from a judgment of the Superior Court of Fresno County.  Alvin M. Harrell III, Judge.

Elisa A. Brandes, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Darren K. Indermill and Catherine Tennant Nieto, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]     Before Peña, Acting P. J., Meehan, J. and De Santos, J.

## INTRODUCTION

Appellant Luis A. Chavez Grana was convicted of assault with a firearm and other charges related to shooting at an occupied residence. He contends on appeal there is insufficient evidence he knew the target residence was occupied to support the assault with a firearm conviction. The People disagree arguing the judgment is supported by sufficient evidence. We conclude substantial evidence exists from which a reasonable trier of fact could find beyond a reasonable doubt appellant's conviction of assault with a firearm.

## PROCEDURAL SUMMARY

Appellant was charged with assault with a firearm and personal use of a firearm enhancement (§§ 245, subd. (a)(2), 12022.5, subd. (a); count 1), shooting at an inhabited dwelling (§ 246, count 2), and possession of a firearm by a felon (§ 29800, subd. (a)(1), count 3). It was alleged appellant had a prior serious felony conviction (§§ 667, subd. (a)(1), 667, subds. (b)-(i), 1170.12, subds. (a)-(d)). A jury found appellant guilty on all counts and found true the firearm enhancement for count 1. In a bifurcated proceeding, appellant admitted the prior serious felony allegation.

The court imposed the following sentence: six years on count 1 (three years doubled), four years for the firearm enhancement, and five years for the prior serious felony enhancement. The court stayed the term on count 2 and imposed a concurrent four-year term on count 3. Appellant filed a timely notice of appeal.

## FACTUAL SUMMARY

In the early hours of November 4, 2023, Enrique Garcia met up with Gabriela M. and three other individuals in a casino parking lot, then drove to Garcia's residence. Garcia drove his own vehicle while the others drove in Gabriela's white vehicle. When they arrived, the white vehicle parked across the street from the front of Garcia's residence.

2.

Garcia's residence had an open floor plan.  The back door of the residence opened to the kitchen, dining room, and living room.  There were no curtains or anything covering the window that was to the left of the back door.  Garcia's backyard was fenced, with an alleyway behind it that was usually kept locked and required a key for access.  Garcia later learned the alleyway was not locked at the time of the incident and had been left open.

Around 6:00 a.m., Garcia left by himself and drove to get food.  It took him about 15 to 20 minutes to return.  When Garcia left, Gabriela and the three other individuals were in his living room.  Garcia called Gabriela while he was out and she did not answer.  Garcia checked his surveillance cameras to see if they were still at his residence, and they were.  On his way back, Garcia's sister, who lived next door to him, called to alert him that somebody was shooting at or from his residence.  She told him there were people running out of his residence.

When Garcia was near his residence, he thought he saw Gabriela's vehicle pass him.  It happened quickly and left Garcia confused.  When he arrived at his residence, it was still dark, but he noticed no one was there anymore.  Garcia parked his vehicle.  Police officers approached him and told him shots were fired at his residence.  Garcia waited outside while the police conducted their investigation.

Garcia informed police he had a surveillance system that records 24 hours a day, seven days a week.  The system would save the videos for a week and then delete and record over them, unless downloaded.  Garcia had four or five cameras placed around the residence, giving him 360 degrees of coverage.  There were two cameras in the backyard, two cameras in the front yard, and one facing the front of the residence.  Garcia was able to watch the surveillance videos in real time through an app on his phone.  He was also able to download the videos that had previously been captured.  Garcia gave police access to the app and surveillance videos on his phone.  The time stamp on his surveillance videos was off by an hour due to the time change and he had not fixed it.

3.

Officers compared the live recording time stamp with the current time on their phone to confirm the camera's time was off by about an hour.

Officer Montreal London responded to the Shot Spotter activation for 23 rounds fired at Garcia's residence. A Shot Spotter is a device that lets officers know when gunshots have been fired and gives the location. On arrival, London was designated as the primary investigating officer. He viewed the surveillance videos and figured out Garcia's time stamp was off. The prosecution played relevant portions of the surveillance videos for the jury and showed them still photographs taken from the videos. Officer London described seeing suspects breaking Garcia's backyard fence and climbing through. The first suspect that entered Garcia's backyard through the back fence was wearing a red hat, black puffer jacket, black shorts and shoes that London described as remarkable, bright, and multicolored with white lining. The second suspect was wearing a red sweater. Then the first and second suspect approached the back door of Garcia's residence. From this video, the prosecution was able to obtain a still photograph showing the first suspect's face and his clothing. Another still photograph showed the first suspect peering into the residence. The video showed the first suspect looking back to the second suspect and then reaching in his pocket and retrieving a firearm that he is holding in his right hand. The first suspect then returns his attention back to the door. A third subject wearing a gray sweater, tan pants, and red shoes joins them in the backyard.

The three suspects then move around to the front of the residence and to the front door. The video shows the first subject no longer has the red hat on, but is still wearing the black puffer jacket, same black shorts, and same remarkable, bright shoes, which he is the only one wearing. The first suspect extends his firearm and begins shooting. Notably, the video shows Gabriela's vehicle still parked in front of the residence at this time. Afterwards, four individuals exit Garcia's residence, get into a vehicle and leave the area.

The prosecution offered evidence showing numerous bullet holes located in Garcia's residence. Garcia observed several bullet holes to his mailbox, and exterior and interior walls of his residence, including his hallway. Garcia observed bullet holes to multiple windows in his residence and shattered glass inside and outside the residence. He observed multiple bullet holes inside the residence to his curtains, television, the window and wall above the living room couch, and several bullet holes all over the couch. Law enforcement located approximately 20 shell casings.

At about 6:22 a.m., Fresno Police Officer Jalen Harris was on patrol when dispatch notified him of the Shot Spotter location. When Harris arrived, he parked on the street by an alleyway and noticed two items on the ground: a red "snapback" hat and a wallet right next to it. The items were lying on the sidewalk between the alleyway and where he parked. Harris conducted a protective sweep of the residence to ensure there were no victims inside. Once it was clear, Harris noticed there were some wooden planks missing from the back gate and thought the hat and wallet might be related to the incident. Harris returned to where he found the wallet, opened it, and located an identification card and photograph belonging to appellant. The wallet and hat were located three to four houses from Garcia's residence.

Around 7:00 a.m., Officer Michael Walker was dispatched to Garcia's residence. After being briefed, Walker and his partner, Officer Lafayette Madden, were directed to attempt to contact Gabriela at her residence. Walker observed the white vehicle in the driveway and parked on the street just north of it. He noticed there was a canal that was directly behind the residence, about eight feet behind the backyard's fence.

Officers approached Gabriela's residence and knocked on the door. Appellant answered the door and talked to the officers through the closed screen door. While Walker spoke with appellant, he had his bodycam video recording. Walker testified he could clearly see what appellant was wearing through the screen door. Walker noticed appellant was wearing a black jacket and had "very distinctive" shoes, which were blue

5.

and purple in color and reminded him of "tropical flavored Skittles." Walker let appellant know he was trying to locate Gabriela because she had been involved in an incident regarding a shooting. Appellant told the officers that he was married to Gabriela but that she had not been home for two days. Gabriela had been going back and forth with another man for the last six months.

Appellant identified himself as Anthony Gonzalez and said his birth date was June 12, 1997. Following their conversation, Officer Walker searched the name and birth date on the system in his patrol car, but he could not find anyone associated or matching that information. Walker became suspicious about appellant and contacted the investigating officer on the shooting case to get the suspect's name. After Walker obtained a name and photograph, he was able to confirm appellant's true identity.

As Officer Walker was conducting this research, he noticed movement out of the corner of his eye. Walker looked in the direction of appellant's backyard and saw the top of appellant's head in the backyard and saw clothes flying over the back fence. Initially Walker thought appellant was trying to flee, but noticed appellant was throwing articles of clothing over the fence towards the canal behind his house. Walker observed appellant throw a dark jacket and a pair of shoes that looked to be the same shoes he just observed appellant wearing. Walker observed his face and was absolutely certain it was appellant.

Thereafter, Officer Walker coordinated a perimeter around the house to make sure appellant did not escape and ordered all occupants of the residence to exit. Walker placed appellant in handcuffs. He was wearing the same shorts as before, but he was no longer wearing the black jacket or the shoes he was wearing at the door. A search of the residence was conducted and no firearm was recovered. Firefighters were able to fish the black jacket and shoes from the canal. Walker identified the recovered jacket and shoes as those appellant was wearing earlier.

Officer Walker viewed the surveillance footage obtained from Garcia's residence and was able to positively identify appellant. He was wearing the same jacket, shorts, and shoes. Appellant's distinct shoes made him easily identifiable.

Detective Allison Lopez was dispatched to Gabriela's residence where possible suspects in the shooting were detained. After watching the surveillance videos of the shooting incident taken at Garcia's residence, Lopez was able to confirm that three of the subjects on the scene at Gabriela's residence were captured in the surveillance videos of the shooting.

Specifically, Lopez identified appellant as the shooter. Lopez could see appellant's face in the video. His eyes and nose were visible; even though he was wearing a ski mask he was easy to identify. The shooter was the one wearing the black puffer jacket, black shorts, a red hat, and "white and teal shoes."[1] Lopez observed the red hat collected at the scene of the shooting and the "white and teal shoes" collected at Gabriela's residence and confirmed them to be the same items the shooter was wearing in the surveillance video. Based on the above, Lopez confirmed appellant was the one holding the firearm in the backyard and the one doing the actual shooting.

Senior district attorney investigator Jacob Rios made multiple attempts to serve Gabriela with a subpoena for trial but was unsuccessful.

The parties stipulated that appellant had suffered a prior felony conviction.

### **DISCUSSION**

Appellant contends the evidence is insufficient to support his conviction for assault with a firearm. Specifically, appellant claims there was insufficient evidence that he knew the residence was occupied when he fired shots at it and lacks proof of the requisite intent to injure another person. We disagree.

---

[1] Although Detective Lopez described the color of appellant's shoes a little differently than Officer Walker, she confirmed that the shoes that were recovered at Gabriela's residence were the same shoes appellant wore in the surveillance video.

**Relevant Factual and Procedural Background**

At trial, the court instructed the jurors on the elements of assault with a firearm as follows:

"The defendant is charged in Count 1 with assault with a firearm, in violation of Penal Code Section 245 (a)(2). To prove the defendant is guilty of this crime, the People must prove the following:

"1. The defendant did an act with a firearm that by [its] nature would directly and probably result in the application of force to a person.

"2. The defendant did that act willfully.

"3. When the defendant acted, he was aware of the facts that will leave a reasonable person to realize that his act by [its] nature would directly and probably result in the application of force to someone and.

"4. When the defendant acted, he had the present ability to apply force with a firearm to a person."

The court also instructed the jury that "[c]ircumstantial evidence does not directly prove the fact … to be decided but is evidence of another fact or group of facts from which you may logically and reasonably conclude the truth of the fact in question." "Both direct and circumstantial evidence are acceptable types of evidence to prove or disprove the elements of a charge, including intent."

During closing argument, the prosecution laid out the evidence that supported the requirement that appellant knew there were people inside the house at the time he fired into it. The prosecution pointed to the surveillance video showing appellant walking up to the residence, pulling out a firearm, and firing multiple rounds into the residence. "The defendant knew that there [were] people inside [Garcia's] residence, and how do we know that, well, … we see him walking to the windows of the back porch, he's peering inside. I think even at one point he tries to open the door. He's looking inside, pulls out a gun as he's looking inside, we see that going on."

8.

More specifically, the prosecutor added, "[w]e also know that [appellant] knows that Gabriela is inside. He's looking into the residence and he is looking inside, and we also know that Gabriela's car is also right across the street from [Garcia's] residence. We know that [appellant] knew what her car was, he's married to her. So based on this circumstantial evidence, it shows that [appellant] knew that she was inside and that he fired those shots into the residence … knowing that she was inside that residence."

**Applicable Law and Standard of Review**

Appellant bears the burden of affirmatively establishing that the evidence was insufficient to sustain a conviction. (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1574.) " 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Avila* (2009) 46 Cal.4th 680, 701 (*Avila*); *People v. Lindberg* (2008) 45 Cal.4th 1, 27; *Jackson v. Virginia* (1979) 443 U.S. 307, 319.) "In so doing, a reviewing court 'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*Avila*, at p. 701; *People v. Kraft* (2000) 23 Cal.4th 978, 1053.) It is the responsibility of the trier of fact "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences" from the facts. (*Jackson v. Virginia*, at p. 319.) " 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' " (*People v. Covarrubias* (2016) 1 Cal.5th 838, 890.)

" ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' " (*Kraft, supra*, 23 Cal.4th at p. 1054; *People v. Thomas* (1992) 2 Cal.4th 489, 514.) If the record supports conflicting inferences, the reviewing court must presume "that the trier of fact resolved

any such conflicts in favor of the prosecution," and the court must "defer to that resolution." (*Jackson v. Virginia*, *supra*, 443 U.S. at p. 326.)

Before a judgment can be set aside for insufficient evidence, it must clearly appear that upon no hypothesis whatsoever is there sufficient evidence to support it. (*People v. Redmond* (1969) 71 Cal.2d 745, 755.) "When the circumstances reasonably justify the [trier of fact's] findings, a reviewing court's opinion that the circumstances might also be reasonably reconciled with contrary findings does not warrant reversal of the judgment." (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1069.) A reviewing court is "not free to reform the verdict simply because another theory is plausible." (*People v. Mora and Rangel* (2018) 5 Cal.5th 442, 490.)

The same standard applies whether the verdict is supported by direct or circumstantial evidence. (*Avila*, *supra*, 46 Cal.4th at p. 701; *People v. Watkins* (2012) 55 Cal.4th 999, 1020; *People v. Catlin* (2001) 26 Cal.4th 81, 139.) An appellate court must accept logical inferences that the trier of fact might have drawn from the circumstantial evidence. (*People v. Streeter* (2012) 54 Cal.4th 205, 241, overruled on other grounds as stated in *People v. Harris* (2013) 57 Cal.4th 804, 834.)

"The elements of assault with a firearm, under section 245, subdivision (a)(2) include (1) an assault, which requires the intent to commit a battery, and (2) the foreseeable consequence of which is the infliction of great bodily injury upon the subject of the assault." (*People v. Cook* (2001) 91 Cal.App.4th 910, 920.)

To convict a defendant of assault with a firearm, the People must prove: (1) the defendant did an act with a firearm that by its nature would directly and probably result in the application of force to a person, (2) the defendant did that act willfully, (3) when the defendant acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone, and (4) when the defendant acted, he had the present ability to apply force with a firearm to a person. (CALCRIM No. 875; see § 245, subd. (a)(2).) Assault with a

deadly weapon is a general intent crime. (*People v. Rocha* (1971) 3 Cal.3d 893, 899.) A defendant commits assault with a firearm when he points the firearm at, towards, or between persons with the weapon in a position to be used instantly. (See *People v. Felix* (2009) 172 Cal.App.4th 1618, 1628 (*Felix*) [an intent to do an act which will injure any reasonably foreseeable person is a sufficient intent for an assault charge].)

**Analysis**

We limit our analysis to the single issue raised by appellant: whether appellant knew the residence was occupied when he fired multiple shots at it. We begin by noting assault with a firearm is a general intent crime and does not require a subjective specific intent to injure another person. (*People v. Rocha*, *supra*, 3 Cal.3d at p. 899 [deadly weapon]; *People v. Lee* (1994) 28 Cal.App.4th 1724, 1736 [firearm]; *Felix*, *supra*, 172 Cal.App.4th at p. 1628.) " '[A]n intent to do an act which will injure any reasonably foreseeable person is a sufficient intent for an assault charge.' " (*Felix,* at p. 1628.) As such, we reject appellant's argument that the prosecution was required to prove appellant intended to injure another person. Instead, the proper determination is whether there is substantial evidence from which a jury could find beyond a reasonable doubt that "when the defendant acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone." (CALCRIM No. 875, see § 245, subd. (a)(2); *Felix*, at p. 1628; *Avila*, *supra*, 46 Cal.4th at p. 701.) We conclude there is.

Based on the evidence, it is clear that Gabriela and the three other guests were in fact at Garcia's residence when appellant shot at it with his firearm. Garcia testified they were in the living room when he left to go to get food. He messaged them while on the way to get food and when they did not answer he checked his surveillance video and saw they were still there. Further, the surveillance video shows Gabriela and the three other people leaving after the shooting ended.

The evidence also shows appellant was aware of facts that would lead a reasonable person to realize that shooting at the residence would directly and probably result in the application of force to someone. (See § 245, subd. (a)(2).) On the night of the shooting, Gabriela's vehicle, which appellant would be familiar with as her husband, was parked at Garcia's residence. Surveillance videos show Gabriela's vehicle outside while appellant was out front just before the shooting. Appellant told officers that Gabriela had been with another man off and on. Therefore, a reasonable jury could infer appellant was aware Gabriela was at this residence.

Additionally, surveillance video showed appellant peeking in the back window of Garcia's residence. It is reasonable to infer that appellant was looking for Gabriela since her vehicle was parked at the residence. There were no curtains or any other window treatment that obstructed or otherwise blocked the view into the residence from the back window. Based on Garcia's testimony that it was still dark when he arrived back at his residence after getting food, a reasonable jury could also infer that since it was dark outside, it made it easier to see inside the residence and made its occupants more visible to appellant. Moreover, a jury could infer from the high number of bullet holes concentrated on the living room couch, that appellant not only knew the residence was occupied, but had observed them sitting on or near the living room couch.

Therefore, there is substantial evidence in the record from which a reasonable jury could find beyond a reasonable doubt that appellant was aware of facts that would lead a reasonable person to realize that shooting at the residence would directly and probably result in the application of force to someone. (See *Avila, supra,* 46 Cal.4th at p. 701.)

The facts in this case are similar to those in *Felix*, *supra*, 172 Cal.App.4th 1618, where the defendant was also claiming there was insufficient evidence he knew it was highly likely that the victims were in the house at the time he fired the gunshots. (*Id*. at p. 1630.) The defendant had been dating his girlfriend for six years and was considered " 'part of the family.' " The defendant had been inside his girlfriend's family's home on

many occasions.  (*Ibid*.)  As such, the defendant knew his girlfriend lived in the home with her family.  The defendant was convicted of shooting at her house at midnight on a weeknight.  (*Ibid*.)  The court relied on the fact that defendant had detailed, intimate knowledge of the house and inhabitants and actually knew he was endangering the lives of three or more members of the family when he fired into the house.  The court concluded the defendant "knew it was highly likely [the victims] were in the house at the time he fired the gunshots" and that "his acts would 'probably and directly result in physical force' against them."  (*Ibid*.)  In the present case, although there is no evidence appellant knew the inside of Garcia's house, he was able to, and did in fact, look inside the house through the back window, which was not obstructed.  Appellant was married to Gabriela and would have known that it was her white vehicle parked in front of Garcia's residence.  He also knew she had been spending time with another man and so he would have known that it was likely that she would be inside the residence.  Therefore, it was logical to infer that appellant knew his act of firing his gun at the residence would probably and directly result in physical force against her inside the house.  (See *ibid.*)

Appellant fails to meet his burden of establishing there is insufficient evidence to sustain his conviction.  (See *People v. Sanghera, supra,* 139 Cal.App.4th at p. 1574.)  His argument that the group could have moved from the living room to another location like the bedrooms where appellant would not have been able to see them through the window is not supported by the evidence.  Garcia testified that while he was on his errand to get food, he checked his surveillance video to make sure they were still at his residence and saw them in the living room.  This was before he received a call from his sister about the gunshots.  Appellant's argument that he may not have noticed his wife Gabriela's vehicle was parked in front of Garcia's house is unpersuasive, making his contention that when Garcia left "it would likely have appeared that the home's only resident was gone" weak and unsupported.  Even considering appellant's arguments, we presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.

13.

(*Avila*, *supra*, 46 Cal.4th at p. 701.)  Since the circumstances reasonably justify the trier of fact's finding that appellant "was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone," the fact that circumstances might also be reasonably reconciled with contrary findings does not warrant reversal of the judgment.  (See *People v. Mendoza*, *supra*, 52 Cal.4th at p. 1069; *People v. Redmond, supra,* 71 Cal.2d at p. 755; § 245, subd. (a)(2).)  The judgment must be affirmed since it cannot be shown that "upon no hypothesis whatever is there sufficient evidence to support it."  (See *Redmond*, at p. 755.)

## DISPOSITION

We affirm the judgment.